Franzini v. Layland, 120 Wis. 72.

FRANZINI, Respondent, vs. LAYLAND and others, Appellants.

*November 20—December 11, 1903.*

*State boundaries: Mississippi river: "Main channel": Acts of Congress: Construction: Bayous: Acquiescence of sovereignties as evidence: Private parties: Riparian rights: Navigable waters: Title to unsurveyed islands: Presumptions: Mistake in public land surveys.*

1. The boundary line between this state and the state of Minnesota, where the Mississippi river divides them, is the center line of the main channel of said river.

2. The main channel of the Mississippi river means the principal navigable and navigated channel, the one customarily followed in steamboat navigation.

3. Such boundary line may be very near the Wisconsin shore at some points, and very near the Minnesota shore at others, according to the location of the main navigable and navigated channel. It is a changing line, subject to property rights, as the pathway of navigation changes, according to the design of locating it at the center of the main channel that being to preserve for all time, within the boundaries of this state, one half of the navigable pathway of the river wherever located.

4. The term "Mississippi river" used in the enabling act (ch. 89, p. 56, 9 U. S. Stats. at Large), descriptive of the boundary between this state and the state of Minnesota, applies to the broad expanse of water flowing in a generally southerly direction, known at the date of such act as such river, not any bayou upon either side thereof.

5. No such bayou, though navigable when the state was admitted into the Union and then furnished and now furnishes the most feasible navigable channel for boats between the entry thereto and outlet thereof, can properly be referred to as the Mississippi river, the main channel of which is traversed by the boundary line between the states.

6. Long acquiescence by sovereignties in a given situation as regards the boundary line between them, is very strong evidence of the right of the matter, is conclusive between private parties, and may be of such length of duration as to be likewise conclusive between sovereignties.

7. A riparian proprietor upon a navigable stream in this state has absolute title to the land to the line of ordinary high water mark by virtue of the chain of title reaching back to the sovereign proprietor; but, as incident thereto, subject to what is

said in the next paragraph, he owns to the center of the stream by the grace of the state, subservient, however, to public rights, substantially the same as those incident to navigable waters at the common law; and the size of the river does not in any event affect this rule.

8. Where a river separates this state and another, the title, by grace of the former, to land owned by a riparian proprietor upon its side of the stream, goes to its boundary line, regardless of whether that is nearer to or further from the shore than the *filum aquæ* of the stream.

9. Unsurveyed islands in navigable rivers in this state are presumed to be appurtenant to the surveyed land near by, within the limits of which they fall as regards riparian rights, and, nothing appearing to the contrary, such an unsurveyed island is presumed to pass with a conveyance of the surveyed land to which it is so appurtenant.

10. In case of a mistake in making the public land surveys, by omitting to survey any island in a river, such mistake can be taken advantage of only by the government, by proper proceedings to be relieved therefrom upon the same ground that any other proprietor might be relieved under the same circumstances. Until it acts in the matter the island will be deemed to be governed by the rule above stated.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Vernon county: J. J. FRUIT, Circuit Judge. *Affirmed.*

Action for damages to real estate caused by cutting and removing therefrom small timber. It was commenced in justice court, and on a plea that the title to real estate would come in question was duly removed to the circuit court. Plaintiff's title to the land involved was put in issue, and was the only matter of consequence controverted upon the trial. The evidence in respect thereto was to the following effect:

The land consists of an island in the Mississippi river not included in the public land surveys of the United States. The area thereof, excluding a bay that indents it from the southeast, is about forty acres. It is within what would be, if they were run out, the boundary lines of section 20, town 13, range 7 west. Such lines on the east, west and south, and

part on the north, were never run, because the territory was covered by water and included within the banks of the Mississippi river. The only land in section 20, of sufficient importance to be taken note of by the public surveyor and reported to the United States Land Office, as he viewed the matter, is in the northeast part thereof, being the southerly part of an island and containing fifty-one acres and a fraction. It was designated and is known as "Lot 1" in said section 20. The survey was made in the latter part of 1846 and reported to the United States Land Office in the early part of 1847. The report thereof, and the official plat of the land according thereto, are to the effect that the territory west of lot 1 and east of the Minnesota shore was in 1846 covered by the water of the Mississippi river proper. The land in question, called "Island No. 4," lies west of lot 1 and is separated therefrom by shallow water, the distance between the two bodies of land being, on the average, about 100 feet. Such territory is called "Sand Slough." In a low stage of water it is entirely closed at the northerly end by a sandbar. In an ordinary stage of water it is not navigable except by small boats. It is not a steamboat channel. While the public surveyor did not mention island No. 4, the evidence is unmistakable that it, in part at least, existed at the date of his survey. As early as 1877 large trees were standing on the westerly side thereof, and also stumps of trees fourteen inches in diameter. In 1846 and long prior thereto, about six miles above the land in question, a part of the water of the Mississippi river flowed from the main body thereof in a narrow but navigable channel, customarily used by steamboats, to the east of the main river, the greatest distance at any point east being about two miles, and connecting with the main river at the southerly point of lot 1 aforesaid. This channel was known at the time the public survey was made as "Coon Slough." It was, on the average, not more than one fifth of the width of what was recognized as the Mississippi river.

The river, so called and platted, was navigable, but Coon Slough formed a cut-off, and, as before indicated, was customarily used by steamboats. Such was substantially the condition of things when the state of Wisconsin was admitted into the Union. All the territory between Coon Slough and the main river—the area thereof being equal to many sections of land—was then considered as east of the Mississippi river and included within the new state of Wisconsin. Several years ago, near the head of Coon Slough, the general government built a dam in the main river so as to turn more· water into Coon Slough. That has considerably changed the relative amount of water flowing in the two channels. However, Coon Slough at the northerly line of lot 1 aforesaid, remains very narrow as compared with the distance from the· westerly side of the land in dispute to the Minnesota shore. Such distance is about 900 feet. It still has the appearance of being the main Mississippi river. Lot 1 aforesaid, being low land and subject to overflow, was, in 1850, held by proper· authority to be swamp land and to belong to the state of Wisconsin as land within its territory under the swamp land act.. It was certified accordingly. March 27, 1895, it was conveyed by the state of Wisconsin to the respondent in this action. No claim was ever made to the land in controversy, either by the general government or by the state of Wisconsin, independently of lot 1. Soon after respondent received his patent he took possession of Island No. 4 as included therein, and was in the actual possession thereof when the· acts complained of occurred. Ever since Wisconsin was admitted into the Union the territory between Coon Slough· and the Mississippi river, so called, has been considered by all public authorities as within the state of Wisconsin. It has exercised ·governmental control over the same for the purpose of taxation and all other purposes; the west channel of the river being recognized by the state of Minnesota as the· boundary water between the two states.

Upon such evidence, and undisputed evidence in respect to defendant's having cut small timber from Island No. 4 and the measure of respondent's damages in case he was entitled to recover, the court directed a verdict in his favor. Judgment was rendered accordingly, exceptions being saved to rulings of the court sufficient to preserve for review the questions discussed in the opinion.

*Silbaugh & Bennett,* for the appellants.

*C. W. Graves* and *Ray B. Graves,* for the respondent.

MARSHALL, J.   Counsel for appellant argue that at least it is a jury question, on the evidence, as to whether Coon Slough is not the boundary water between the states of Wisconsin and Minnesota, which, if solved in appellants' favor, would leave the entire territory west of the slough within the latter state.   In support of that it is urged that the center of the navigable channel of the river is the true boundary line; and that the evidence is to the effect that Coon Slough was, when Wisconsin was admitted into the Union, and ever since has been, customarily used as the steamboat channel.   The evidence as a whole leaves little doubt, if any, that the west channel of the river—the part known as the Mississippi river in 1846 and as far back as we have any history of the matter, and ever since that date—is what the law-making power had in mind when the act of Congress was passed enabling Wisconsin to be admitted into the Union, and fixing the westerly boundary thereof at the center line of the channel of the Mississippi river.   The language of the enabling act (ch. 89, p. 56, 9 U. S. Stats. at Large) clearly indicates that it was framed with reference to rivers as they were then understood to exist and were shown upon maps of recognized accuracy. It is hardly worthy of serious thought that a narrow, though navigable, bayou upon either side of the river at any point could have been supposed would ever be taken as the Mississippi river mentioned in the act.   There are many such

bayous along the Mississippi river upon both sides thereof, some of them being many miles in length and with much territory between them and the main river, but we venture to say that none of them were ever considered as forming boundary water between states under any enabling act admitting such states into the Union and fixing the boundary between the same at the center of the main channel of the river. If that were not sufficient on this branch of the case, the undisputed evidence that for over fifty years, for all governmental and other purposes, the territory between Coon Slough and the Mississippi river proper has been considered by this state, the general government, and the state of Minnesota as well, as east of the boundary line between the two states, would be conclusive evidence, at least in a suit between private parties, of its proper location. Acquiescence for a long period of time is evidentiary of the right involved between sovereignties as well as between individuals. In *Indiana v. Kentucky,* 136 U. S. 479, 510, 10 Sup. Ct. 1051, 1054, involving a dispute as to the boundary line between those states, as regards a situation very similar to the one before us—the point of dissimilarity being one which renders the rule announced peculiarly applicable here, in that, while no dispute has ever arisen between this state and Minnesota as to whether the territory in question is within the dominion of Wisconsin, a dispute there existed as to the boundary, though it was inconsistent with acquiescence that had continued for a long term of years—the federal court said:

"The long acquiescence in the exercise by Kentucky of dominion and jurisdiction over the island is more potential than the recollections of all the witnesses produced on either side. Such acquiescence in the assertion of authority by the state of Kentucky, such omission to take any steps to assert her present claim by the state of Indiana, can only be regarded as a recognition of the right of Kentucky too plain to be overcome, except by the clearest and most unquestioned proof. It is a principle of public law universally recognized,

that long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority."

In a similar controversy between the states of Rhode Island and Massachusetts (decided by the same court), 4 How. 591, it was held that long acquiescence by one state in a claim of sovereignty by another, in respect to territory upon the boundary line between the two, was sufficient to remove all doubt as to the right of the state to exercise such authority, this language being used:

"No human transactions are unaffected by time. . . . For the security of rights, whether of states or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be invoked with greater justice and propriety than in a case of disputed boundary."

Appellants' counsel, conceding for the argument that the western boundary of this state is west of lot 1 aforesaid, insist that it is midway between the westerly meander line of said lot and the Minnesota shore. On that theory they easily establish the *locus in quo* without this state, it being 1,150 feet from such meander line and only 900 feet from such shore. In that counsel start with a false premise; therefore the conclusion is necessarily wrong. The boundary line in question is not the center line of the Mississippi river measuring from shore to shore, but is the center line of the main channel of the river, the navigable and navigated channel, regardless of the distance thereof from either shore. It may be very near the Minnesota shore at some points, and very near the Wisconsin shore at others, according as the deepwater pathway used for steamboat navigation varies. It is not referable, necessarily, to the condition of the channel at the time the state was admitted into the Union. It is a shifting line, subject, however, to property rights, the idea, em-

bodied in the enabling act permitting Wisconsin to come into the Union as a state, being that there shall be for all time preserved within its boundary one half of the main navigable channel of the river. This has been a subject of much consideration by the courts in years past, and there is nothing in respect thereto left to be settled. In *Dunleith & D. B. Co. v. Dubuque Co.* 55 Iowa, 558, 8 N. W. 443, the supreme court of Iowa took the ground that the language of the enabling act respecting the boundary line between that state and Illinois, should be construed to mean the center line of the river, measuring from shore to shore, arguing that such must be the case since the center line of deep water, followed as the navigable pathway of the river, is sinuous, imperceptible to ordinary observation, unascertainable other than by soundings, unknown to persons other than experienced navigators, and constantly changing.

"It cannot be possible," said the court, "that congress and the people of the state, in describing its boundary, used the word 'channel' to describe the sinuous, obscure and changing line of navigation, rather than the broad and distinctly defined bed of the main river. The center of this river-bed channel may be readily determined, while the center of the navigable channel often could not be known with certainty. The first is a fit boundary line of a state. The second cannot be."

In *Buttenuth v. St. Louis B. Co.* 123 Ill. 535, 17 N. E. 439, the Illinois supreme court took exactly the opposite view, holding that not only the literal sense of the language of the enabling act fixing the boundary line of that state upon the west, but the sense thereof when applied to the object sought to be attained thereby, is that such boundary is the center line of the main channel of the river, the channel used for navigation by steamboats; and that it was contemplated by congress that such line should vary according as the navigable and navigated channel of the river should change, to

the end that each state should possess within its boundaries. for all time one half of such channel. This language was used by the court:

"It is the free navigation of the river—when such river constitutes a common boundary, that part on which boats can and do pass, sometimes called 'nature's pathway'—that states demand shall be secured to them. When a river, navigable in fact, is taken or agreed upon as the boundary between two nations or states, the utility of the main channel, or, what is the same thing, the navigable part of the river, is too great to admit a supposition that either state intended to surrender to the state or nation occupying the opposite shore the whole of the principal channel or highway for vessels, and thus debar its own vessels the right of passing to and fro for the purposes of defense and commerce."

Later the diverse views held as indicated were considered by the federal supreme court, on appeal to its original jurisdiction to have the meaning of the term "center of the main channel" as used in the enabling act judicially determined, and the boundary line between the states, at the several bridges between such states judicially established, resulting in the view held by the Illinois court being adopted, the court saying:

"The true line in navigable rivers between the states of the Union which separates the jurisdiction of one from the other is the middle of the main channel of the river. Thus the jurisdiction of each state extends to the thread of the stream, that is, to the 'mid-channel,' and, if there be several channels, to the middle of the principal one, or, rather, the one usually followed."

In accordance with that view a judgment was rendered to the effect that the boundary line between the states of Illinois and Iowa was at the middle of the main navigable channel of the Mississippi river. *Iowa v. Illinois,* 147 U. S. 1,. 13 Sup. Ct. 239.

From the foregoing it is obvious that the boundary line between this state and Minnesota, at the place in question,

is somewhere west of Island No. 4, upon which the alleged trespass was committed. No one will question that the main navigable channel of the river proper is and always has been, since Wisconsin was admitted into the Union, to the west of such island. The body of water east of the island, called "Sand Slough," does not now appear to be, nor to have been during the last fifty years, suitable for steamboat channel, except on occasions of high water. There really is, at the point in question, but one navigable channel in the river proper, and that is west of Island No. 4. Therefore, if the *locus in quo* is appurtenant to any land from which it is separated by water, and of which it is, in a legal sense, a part under the law respecting riparian rights, that land is lot 1, which respondent owns.

Appellants' counsel further contend that the rule which generally prevails in this state, that a riparian proprietor of land bounded by a river not navigable takes absolutely to the center of the stream, and on a navigable river to the center thereof by such a qualified title as will not violate the public rights which were designed to be preserved to the people in the transfer of the submerged territory to the state, should not apply to large rivers like the Mississippi. No authority is cited to support such contention, and we venture to say that none exists. The authorities are distinctly to the effect that no discrimination can reasonably be made on account of the side of rivers. *Jones v. Soulard,* 24 How. 41. This state, by judicial authority so long acquiesced in as to become a rule of property, quite early established as its policy the doctrine that the title to a riparian proprietor upon a navigable stream goes not by force of his patent, whether received from the government or from the state, but by the mere favor or concession of the state to the center of the stream, subject to all those public rights which were intended to be preserved for the enjoyment of the whole people by vesting the title to the beds of such streams in it in trust for their

use. *Willow River Club v. Wade,* 100 Wis. 103, 118, 76 N. W. 273; *Illinois S. Co. v. Bilot,* 109 Wis. 418, 426, 84 N. W. 855, 85 N. W. 402; *Illinois C. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110. Whether such policy be out of harmony with the original design, or whether it was the best one to establish, cannot now be a subject for judicial consideration. There is no opportunity now for retreat. The state has taken its position, and property rights upon all our rivers have become vested with regard thereto, and the supreme judicial authority has many times affirmed that it possesses discretionary authority to part with its trust property to the extent mentioned,—that is, in such ways as do not substantially affect the purposes of the trust. *Railroad Co. v. Schurmeir,* 7 Wall. 272; *Rundle v. Delaware & R. C. Co.* 14 How. 80; *Barney v. Keokuk,* 94 U. S. 324.

The rule above stated must necessarily be modified as regards riparian proprietors upon a stream forming a boundary between two states, where the dividing line of jurisdiction is the center of the main channel of such stream, since the state cannot clothe a person with any interest in land beyond its boundary; and the same reason that occasions the concession to a riparian proprietor upon a navigable stream wholly within its boundaries, to the thread of such stream, requires the concession to go to such dividing line where the riparian proprietor is upon a navigable boundary river, regardless of whether such line be nearer to or further from his shore than the *filum aquæ* of the stream. So we find it held in the books that such is the case even where the boundary line of a state divided from another by a navigable river is at low water mark on the opposite shore. *Young v. Harrison,* 6 Ga. 132; *Berry v. Snyder,* 3 Bush, 293; *Blanchard's Lessee v. Porter,* 11 Ohio, 138; *Ware v. Houk* (Com. Pl.) 23 Wkly. Law Bul. 205. In *Berry v. Snyder,* ROBERTSON, J., who dissented from the judgment of the court as to a riparian proprietor

on the southerly side of the Ohio river having any title to
the bed of the river, said as to the legitimate effect of the op-
posite view:

"Kentucky owns the Ohio river on its border, and low
water mark on the opposite shore is its northern limit; and,
according to Kent, if a grantee of land on the Ohio is bounded
by ordinary low-water mark, he will hold to low-water mark
on the opposite side—that is, the whole river will be the
boundary, and the grantee will be entitled to all islands
formed in the river by accretion or eruption."

Little more need be said to fully decide this case. We
deem the law too well settled here to warrant discussing the
subject, that a riparian proprietor on a river, nothing appear-
ing clearly to the contrary, owns, as incident to the shore, all
islands opposite the same so far as his riparian rights extend.
*Chandos v. Mack,* 77 Wis. 573, 46 N. W. 803. The convey-
ance to the riparian proprietor of the title to the island in
such a case is deemed to have been included in the convey-
ance of the main land. As regards the original proprietor,
the general government, the omission to take notice of the
existence of an island in making the public land surveys, and
approval of the survey by sovereign authority, evidences that
the omitted land was intended to pass as an incident of the
land it lies opposite of, and is appurtenant to it if to any.
*Fuller v. Dauphin,* 124 Ill. 542, 16 N. E. 917. Such evi-
dence is conclusive in the absence of a judicial determination
in favor of the government, relieving it from mistake upon
the same grounds that a private party might be relieved under
the same or similar circumstances. *Murphy v. Kirwan,* 103
Fed. 104. Obviously, a private person cannot raise the ques-
tion if the government sees fit not to do so.

The foregoing rules indicate that the trial court could not
well have taken any other course than to hold that the land
in controversy belonged to respondent and that he was en-
titled to recover. There was no question of fact upon the evi-

dence upon which there was any room for a difference of opinion. The law was properly applied thereto, and the judgment must therefore be affirmed.

*By the Court.*—The judgment is affirmed.