George BLASK, Plaintiff,

v.

Le Roy W. SOWL, Bart Foster, and Donald Gray, Defendants.

Civ. No. 3590.

United States District Court, W. D. Wisconsin.

Feb. 13, 1967.

Quincy H. Hale, William P. Skemp, La Crosse, Wis., for plaintiff.

N. H. Heffernan (former U. S. Atty.) Edmund Nix (former U. S. Atty.) Madison, Wis., Daniel S. Boos, U. S. Dept. of Interior, Minneapolis, Minn., for defendants.

## DECISION AND ORDER

JAMES E. DOYLE, District Judge.

This action is in ejectment. Plaintiff claims a superior right to possession of the northern portion of an island in the Mississippi River, as against the claim of the defendants. The defendants are employees of the Bureau of Sport Fisheries and Wildlife, United States Department of the Interior.

The island is known as Island 126. It is situated in the State of Wisconsin, east of the thread of the river. The disputed portion of the island is the portion lying directly west of lands which are presently shorelands and which are known as Lots 5, 6, and 7, Section 32, Township 13 North, Range 7 West, Vernon County, Wisconsin. (For brevity, reference will be made hereinafter to "Island 126" rather than to "the disputed northern portion of Island 126.")

In 1937 the United States surveyed the present shorelots 5, 6, and 7, and in 1943 it patented them to one Morris, who had been occupying them since about 1920 or earlier. In 1948 Morris deeded shorelots 5, 6, and 7 to plaintiff. In 1962 plaintiff conveyed shorelots 5, 6, and 7 to Dairyland Power Cooperative, reserving all his right, title, and interest in Island 126. For reasons which will be explained, he asserts that by reason of this sequence, he presently enjoys an estate in fee simple in Island 126, and, therefore, a right to possession superior to that of the defendants. He alleges that defendants have been unlawfully withholding from him possession of Island 126, since September 25, 1962. Defendants admit that they have been withholding possession from plaintiff. They allege that they have been acting pursuant to Executive Order No. 4280, promulgated August 7, 1925, pursuant to Congressional Acts of June 25, 1910

(36 Stat. 847), August 24, 1912 (37 Stat. 497), and June 7, 1924 (43 Stat. 650), by virtue of which executive order Island 126 was placed in the Upper Mississippi Wildlife and Fish Refuge.

This action was commenced in the Circuit Court for Vernon County, Wisconsin. It was removed to this court. Authority for the removal is claimed under 28 U.S.C. Sec. 1442(a), providing for removal of: "A civil action * * * commenced in a State court against * * *: (1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office * * *." At the trial, it was also stipulated that the complaint was amended to allege that the plaintiff is a citizen of Wisconsin, that each of the defendants is a citizen of a state other than Wisconsin, and that the amount in controversy, exclusive of interest and costs, exceeds $10,000; it was further stipulated that the said allegations are admitted by the defendants. I find jurisdiction over the parties and subject matter.

By their answer to the amended complaint, defendants pleaded that the plaintiff had failed to join the United States, that the United States is an indispensable party to the action, that the United States cannot be joined because it has not consented to be sued, and that the court therefore lacks jurisdiction. Subsequently these contentions were embodied in a motion to dismiss. The said motion was subsequently briefed, argued, and denied. In denying the motion, I pointed to the allegations in the amended complaint that: "the defendants have no authority to deprive plaintiff of his said land, and their acts in so doing are unconstitutional; that the acts of the defendants were and are an unconstitutional taking of plaintiff's lands." Although this language is rather broad, I held that, in accordance with Rule 8(a) of the Federal Rules of Civil Procedure, it sufficiently alleged "that the holding constitutes an unconstitutional taking of property without just compensation," and that "the defendants'

possession of the property was an un-constitutional use of their power and was, therefore, not validly authorized by the sovereign." Larson v. Domestic & Foreign Corp., 337 U.S. 682, 697, 69 S.Ct. 1457, 1465, 93 L.Ed. 1628 (1949); United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882); Malone v. Bowdoin, 369 U.S. 643, 647–648, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962). Following the trial, I continue to believe, and so hold, that this defense raised by the answer and by the earlier motion is not valid.

In this ejectment action, the law of Wisconsin is to be applied. 28 U.S.C., Sec. 1652. Among the basic requirements is a showing by plaintiff that his right to possession is superior to that of defendants. "It is a well-established principle which has acquired the force of a maxim that the plaintiff in ejectment must prevail if at all, on the strength of his own title and not upon the weakness of his adversary's." Chris Schroeder & Sons Co. v. Lincoln County, 244 Wis. 178, 182, 11 N.W.2d 665, 666 (1943). "On the other hand, in order to prevail, plaintiff is not required to establish perfect title, all that is necessary being proof of a title or right superior to that of defendant." 25 Am. Jur.2d Ejectment, Sec. 19 (1966).

To evaluate plaintiff's assertedly superior right to possession, it is necessary to consider certain facts which I find as follows:

Between 1851 and 1859 the United States patented and sold to certain individuals the then shorelands along the east bank of the Mississippi River at the latitude of the lands now involved in the present action. The lands so patented and sold by the United States in the 1850's had been surveyed and described as Lots 1, 2, 3 and 4 of Section 32, Township 13 North, Range 7 West, Bad Ax (now Vernon) County, Wisconsin. At that time there lay immediately to the west of Lots 1, 2, 3 and 4 a river island (previously observed by surveyors) separated from Lots 1, 2, 3 and 4 by Sunfish Slough; the westerly boundary of said island was defined by a shallow slough known as Thief Slough; immediately west of Thief Slough lay the island now called Island 126. Both of these islands lay east of the thread of the river. Since 1848 the thread of the river has marked the western boundary of the State of Wisconsin.

By about 1894 Sunfish Slough had disappeared. The lands lying east of Thief Slough and west of Lots 1, 2, 3 and 4 had ceased to be an island and had replaced Lots 1, 2, 3 and 4 as the eastern shore of the Mississippi River. However, it was not until 1937 that these new shorelands, the former island, were surveyed, and designated as Lots 5, 6 and 7, Section 32, Township 13 North, Range 7 West, Vernon County, Wisconsin. In 1943 the United States granted Lots 5, 6, and 7, by patent to James Morris, who had settled on these newer shorelands in about 1895. This patent describes only Lots 5, 6 and 7. Morris then entered into possession of Lots 5, 6 and 7 under claim of title, founding such claim upon the 1943 patent to him, as being a conveyance of Lots 5, 6 and 7.

Meantime, the island now called Island 126 had remained an island separated from the newer shorelands (Lots 5, 6 and 7) by Thief Slough. Island 126 has been in substantially its present condition since 1848 except for some elevation of land levels by reason of dredging operations, and some elevation of water at low water levels by reason of the construction of dams in the river. It was shown on maps as early as 1894 and perhaps earlier.

Plaintiff occupied Lots 5, 6 and 7, beginning in 1943 as a tenant of Morris; he began his purchase of Lots 5, 6 and 7 from Morris in 1946; in 1948, Morris conveyed Lots 5, 6 and 7 to plaintiff by deed without reservation. As noted above, when plaintiff deeded Lots 5, 6 and 7 to Dairyland Power Cooperative in 1962, in connection with a condemnation proceeding,

he reserved all his right, title and interest in Lot 126. For more than 10 years, continuously, prior to September 25, 1962 (when defendants commenced to withhold possession of Island 126 from plaintiff), indeed from as early as 1920, Morris, and later the plaintiff, had usually cultivated and improved Lots 5, 6 and 7 and had used them as a farm; this use was open, notorious, and exclusive; from 1943 on, it was under claim of title founded upon the 1943 patent to Morris.

The theory of plaintiff's action, based upon the facts as found above, is this:

1.  When the United States granted patents in the 1850's to the then shore Lots 1, 2, 3, and 4, the patentees automatically, by operation of Wisconsin law, became the owners of all land lying directly west of Lots 1, 2, 3, and 4, but east of the thread of the river. Franzini v. Layland, 120 Wis. 72 [97 N.W. 499] (1903); Chandos v. Mack, 77 Wis. 573, 46 N.W. 803, 10 L.R.A. 207 (1890). Thus the patentees of Lots 1, 2, 3, and 4 became the owners of the then island, which later became shore Lots 5, 6 and 7, and also the island farther to the west, which is now called Island 126.

2.  From the 1850's on, the United States lacked any right, title or interest in the then island, which later became shore Lots 5, 6 and 7, or in Island 126. Therefore, the President lacked power in 1925 to place Island 126, by implication, in the Upper Mississippi Wildlife and Fish Refuge.

3.  Although lacking any right, title or interest in Lots 5, 6 and 7 and in Island 126 from the 1850's on, the United States nevertheless purported to convey Lots 5, 6 and 7 to James Morris by patent in 1943. From 1943 until September 25, 1962, when defendants commenced to withhold possession of Island 126 from plaintiff, Mor-

ris and then the plaintiff had "entered into the possession of [Lots 5, 6 and 7] under claim of title, exclusive of any other right, founding such claim upon some written instrument [the 1943 patent from the United States to Morris], as being a conveyance of the premises in question, * * and * * * there has been a continual occupation and possession of the premises included in such instrument * * * or of some part of such premises under such claim for ten years * *." Section 330.06, Wis.Stat.1961 (now Section 893.06, Wis.Stat. 1965). Under said statute, therefore, the premises "so included" in the 1943 patent "shall be deemed to have been held adversely." Under Section 330.10, Wis.Stat.1961 (now Section 893.10, Wis.Stat. 1965), an adverse possession of ten years under section 330.06 "shall constitute a bar to an action for the recovery of such real estate so held adversely or of the possession thereof."

4.  Since, under Wisconsin law, the owner of the shoreland automatically and by operation of law becomes the owner of all lands to the thread of the river, the plaintiff, as owner by adverse possession of Lots 5, 6 and 7, automatically became the owner of Island 126 as well.

The first link in the chain of this argument is that in the 1850's, when the United States granted patents to the then shore Lots 1, 2, 3, and 4, the patentees, automatically and by operation of law, became the owners of all lands lying between the shore and the thread of the river. It is Wisconsin law upon which plaintiff rests as authority for this proposition, and he states the Wisconsin rule correctly. Chandos v. Mack, 77 Wis. 573, 46 N.W. 803, 10 L.R.A. 207 (1890); Franzini v. Layland, 120 Wis. 72, 97 N.W. 499 (1903). As authority for the proposition that this Wisconsin

rule is the rule to be applied as to this effect of the patents of the 1850's, plaintiff relies upon a series of decisions by the Supreme Court of the United States, of which United States v. Chandler-Dunbar Water Power Co., 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881 (1908), is representative.

In *Chandler-Dunbar,* the Court accepted the accuracy of an allegation that the bed of a river "passed to Michigan when Michigan became a State, Pollard v. Hagan, 3 How. 212 [11 L.Ed. 565]; Shively v. Bowlby, 152 U.S. 1 [14 S.Ct. 548, 38 L.Ed. 331], subject to the same public trusts and limitations as lands under tide waters on the borders of the sea. Illinois Central R.R. Co. v. Illinois, 146 U.S. 387 [13 S.Ct. 110, 36 L.Ed. 1018]." 209 U.S. at 451, 28 S.Ct. at 580. It continued: "The bed of the river could not be conveyed by the patent of the United States alone, but, if such is the law of the State, the bed will pass to the patentee by the help of that law, unless there is some special reason to the contrary * * *." *Ibid.*

In Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490 (1913), however, the Court distinguished sharply between "the bed of the stream or land under the water" and an island. 227 U.S., at 244, 33 S.Ct. at 244. The river bed or submerged lands passed to the state when it became a state, or came "within the disposing influence of its laws"; but islands "remained the property of the United States and subject to disposal under its laws, as did the island which was in controversy in Mission Rock Co. v. United States, (9 Cir.) 109 Fed.Rep. 763, 769, 770, and United States v. Mission Rock Co., 189 U.S. 391 [23 S.Ct. 606, 47 L.Ed. 865]." *Ibid.*

In Scott v. Lattig, the Court's attention was drawn to several earlier decisions in which land formations above the water's surface had been held subject to state ownership or subject to disposal under the state's laws. But these cases were expressly distinguished: Grand Rapids & Indiana Railroad Co. v. Butler, 159 U.S. 87, 15 S.Ct. 991, 40 L.Ed. 85 (1895) (in which the Court was said to have "left it uncertain whether the so-called island was more than 'a low sand bar, covered a good part of the year with water.' " 227 U.S. at 244, 33 S.Ct. at 244); United States v. Chandler-Dunbar Co., 209 U.S. 447, 451, 28 S.Ct. 579, 52 L.Ed. 881 (1908) (in which the Court had described the "islands" as "little more than rocks rising very slightly above the level of the water, and contain respectively a small fraction of an acre and a little more than an acre"); and Whitaker v. McBride, 197 U.S. 510, 25 S.Ct. 530, 49 L.Ed. 857 (1905) (in which the controversy was wholly among private parties and the Court explicitly reserved the question of the rights of the United States with respect to the island).

In Martin v. Waddell, 16 Pet. 367, 410, 10 L.Ed. 997 (1842), it was said that when the American Revolution took place, "the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the government." It is this doctrine which appears to underlie the rule in Scott v. Lattig. Each state admitted to the Union after its formation has been admitted "on an equal footing with the original states." Pollard's Lessee v. Hagan et al., 3 How. 212, 229, 11 L.Ed. 565 (1845). Thus, the Act of Congress of August 6, 1846 (9 Statutes at Large, Chapter LXXXIX) enabling the people of Wisconsin to form a constitution and state government, provided that Wisconsin's admission into the Union was to be "on an equal footing with the original states in all respects whatsoever." To this Act of Congress, Article 2, Section 2 of the Wisconsin Constitution responded by declaring that the "propositions contained in the Act of Congress are hereby accepted, ratified and confirmed * *." The decisive point in the sequence, however, is that the rights of each of the·

original 13 states and of each state subsequently admitted, with respect to navigable waters, reach only to the waters "and the soils *under* them" (emphasis added). Martin v. Waddell, supra, 16 Pet. at 410, 10 L.Ed. 997.

From the discussion in Scott v. Lattig, it is obvious that on occasion the Court had extended the ownership or the "disposing influence" of the states to land rising above the surface of the waters. However, in Scott v. Lattig the Court disapproved such departures and sought to dismiss the earlier precedents as *de minimis*. In the wake of Scott v. Lattig, it is doubtful whether even the most minimal land formation rising above the surface of navigable waters may be held to have passed to a state or to have come within the disposing influence of its laws. Even if some discretion survives, however, it is clear that in the 1850's not only the then island which has now become shore Lots 5, 6 and 7, but also Island 126, were substantial land formations. It has been stipulated: "that Island 126 is approximately one mile long north and south, is shaped like a snowshoe, and is at its widest point approximately 600 feet east and west and contains possibly 55 acres of exposed land at low water stage." It has also been stipulated: "that Island 126 has been in substantially its present condition since 1848 except for some elevation of water at low water stages by reason of the government dams and some elevation of land levels by reason of dredging operations."

Plaintiff seeks escape from Scott v. Lattig and United States v. Mission Rock Co., 109 F. 763 (C.A.9th, 1901), 189 U.S. 391, 23 S.Ct. 606, 47 L.Ed. 865 (1903), by asserting that these decisions dealt, respectively, with an island included in the Louisiana Purchase and islands ceded from Mexico, whereas in the present case the island had been a part of the Northwest Territory. It is contended that the law applicable to Island 126, as a part of the Northwest Territory, follows the old law of the

State of Virginia. This contention has not been elucidated. However, it is not here relevant that among the various states with their varying legal traditions there may be varying substantive rules defining riparian rights. The point is that, under Scott v. Lattig, these substantive rules may be applied by the states only to lands under the surface of navigable waters and not to lands rising above their surface.

■■ I conclude that the patentees of the patents of the 1850's to Lots 1, 2, 3 and 4 received no title, interest, or right to possession with respect either to the then island which has since become shore Lots 5, 6 and 7, or with respect to Island 126. Accordingly, Island 126 "remained the property of the United States and subject to disposal under its laws," Scott v. Lattig, 227 at 244, 33 S.Ct. at 244. Thus, in 1925 it remained an island "belonging to the United States" and was placed in the Upper Mississippi Wildlife and Fish Refuge by Executive Order No. 4280 (1925). Plaintiff, through his predecessor Morris, clearly has not obtained any interest in Island 126 by any express grant or conveyance by the United States, whether through the 1943 patent to Morris or otherwise. Nor can it be said that, by implication, the 1943 patent to Morris carried with it any interest in Island 126; that patent was limited by its terms to Lots 5, 6 and 7, and Island 126 had been placed in the Refuge 18 years earlier. Although the contention has not been advanced, perhaps it should be made explicit that plaintiff could acquire no rights as against the United States by virtue of adverse possession of Island 126 itself. 3 Am.Jur.2d "Adverse Possession" sec. 205 (1962); Annot., 55 A.L.R.2d 554, 563 (1957).

Plaintiff has failed to establish a claim to Island 126 superior to that of the defendants.

For the reasons stated above, and upon the entire record herein, it is ordered that this action is hereby dismissed, with prejudice and with costs.