R.W. Docks & Slips, Plaintiff-Appellant-Petitioner,

v.

State of Wisconsin and Wisconsin Department of Natural Resources, Defendants-Respondents.

Supreme Court

*No. 99–2904. Oral argument April 30, 2001.—Decided June 28, 2001.*

2001 WI 73

(Also reported in 628 N.W.2d 781.)

500

For the plaintiff-appellant-petitioner there were briefs by *Jason W. Whitley* and *Novitzke, Gust & Sempf*, Amery, and oral argument by *Jason W. Whitley*.

For the defendants-respondents the cause was argued by *JoAnne F. Kloppenburg*, assistant attorney

general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. DIANE S. SYKES, J. This case pits a small emergent weedbed along the shores of Lake Superior in Bayfield, Wisconsin, against the developer of a private marina on those same shores. The Wisconsin Department of Natural Resources sided with the weedbed, and denied the developer a dredging permit needed to complete the final phase of the marina development. The case has an ironic twist: the small emergent weedbed would not have "emerged" at all were it not for the calming effect of a breakwater the developer had built in the early stages of the project. The presence of the emergent weedbed prompted the DNR to block the developer's construction of the last set of boat slips in the marina, 71 out of a total of 272 slips.

¶ 2. So the developer took the DNR to court, alleging a regulatory taking without just compensation. The case was dismissed on summary judgment, and the court of appeals affirmed, concluding that because the developer retained the benefit of all or substantially all of its property—including over 200 boat slips and various recreational facilities associated with the marina onshore—the denial of a permit for the construction of the remaining boat slips was not an unconstitutional taking.

¶ 3. We affirm. As takings law has evolved, there is no compensable categorical taking unless the regulatory action in question deprives a property owner of all economically beneficial use of his property. We do not perform the analysis piecemeal, but, rather, consider the property as a whole in order to determine the extent of the deprivation. Because the denial of the

dredging permit did not deny the marina developer all economically beneficial use of its property, there was no categorical regulatory taking.

¶ 4. Further, and again considering the property as a whole, the regulatory action in this case at most affected only the developer's riparian right of reasonable access to the lake, which is subordinate to the public trust doctrine. Therefore, the DNR's action did not so severely impact or interfere with the developer's reasonable investment expectations as to constitute an unconstitutional taking under traditional, ad hoc takings analysis.

I

¶ 5. The relevant facts are undisputed. R.W. Docks, a general partnership in the business of developing marinas, is the riparian owner of 1100 feet of frontage along Lake Superior in Bayfield, Wisconsin. In 1969, Docks began building a marina, called Port Superior, on this lake frontage land. At the outset, Docks sought and obtained permits from the DNR and the Army Corps of Engineers to construct a breakwater and boat harbor in connection with the marina development.

¶ 6. The marina was then built in stages. The initial phases of the project consisted of the breakwater, several docks eventually containing 201 boat slips, a sea wall, a lagoon, a solid pile quay structure placed on the lakebed, a port, racquetball club, tennis court, and supporting infrastructure. Throughout the gradual development of the marina, Docks sought and received the necessary permits from the DNR, including dredging permits pursuant to Wis. Stat. § 30.20.

¶ 7. In 1977, Docks converted the marina into condominiums. The 201 condominium boat slips, each

of which included an undivided interest in the common areas of the marina facilities, were developed and sold before Docks obtained the necessary permits to complete construction of the final 71 boat slips at the marina.

¶ 8. In 1983, Docks applied to the DNR for a permit to dredge 20,000 cubic yards of material from the lakebed, a necessary prerequisite to the completion of the remaining 71 boat slips. The DNR, after expressing concern over the environmental impact of the dredging, divided the application in two, the first to remove 5,000 cubic yards, and the second to remove 15,000 cubic yards of lakebed material. The DNR then granted the first dredging permit. In 1986, the DNR denied the second, larger dredging permit, and without the permit, the final 71 boat slips could not be built.

¶ 9. The permit was denied primarily because a small emergent weedbed had developed near the shore within the marina as a result of the sheltering effect of the breakwater that Docks had built. Weedbeds, evidently, are good for many things, including the proliferation of game fish, forage fish and associated macroinvertebrates and zooplankton, and so the DNR acted to protect this environmentally sensitive natural resource.

¶ 10. After exhausting available administrative appeals and judicial review of the DNR's action, Docks sued the DNR in circuit court alleging an unconstitutional taking of its property without just compensation. The Bayfield County Circuit Court, the Honorable Thomas J. Gallagher, granted the DNR's motion for summary judgment, concluding that: (1) Docks did not have a recognizable property interest in the 71 undeveloped boat slips; (2) even if Docks had a recognizable property interest in the 71 undeveloped boat slips,

there was no unconstitutional taking because its riparian right to construct structures on the bed of Lake Superior was subject to the public trust doctrine; and (3) there was no unconstitutional taking because Docks retained considerable practical use of the property.

¶ 11. The court of appeals affirmed only the last conclusion of the circuit court, refraining from addressing the alternate arguments. The court of appeals agreed that the denial of the final dredging permit did not constitute a regulatory taking because Docks maintained the benefit and use of all or substantially all of its marina property. Furthermore, the court concluded that Docks assumed the risk inherent in commencing the project without all necessary permits, and therefore any economic loss it suffered as a result of the inability to build the last 71 slips could not be transferred to the State on a regulatory takings theory. We accepted review.

II

¶ 12. We review a circuit court's decision granting or denying a motion for summary judgment independently, using the same methodology as the circuit court. *Wisconsin Dep't of Corrections v. Kliesmet*, 211 Wis. 2d 254, 259, 564 N.W.2d 742 (1997); Wis. Stat. § 802.08(2). "[S]ummary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Kenefick v. Hitchcock*, 187 Wis. 2d 218, 224, 522 N.W.2d 261 (Ct. App. 1994).

¶ 13. The issue in this case is whether the DNR's denial of the final dredging permit constituted a regulatory taking of Docks' property without just

compensation. This is also a question of law that we review without deference to the lower courts. *Zealy v. City of Waukesha*, 201 Wis. 2d 365, 372, 548 N.W.2d 528 (1996). The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." Article I, Section 13 of the Wisconsin Constitution provides that "[t]he property of no person shall be taken for public use without just compensation therefor." We have stated that:

> Takings jurisprudence has developed from two competing principles: on one hand, respect for the property rights of individuals; on the other, recognition that the government retains the ability, in furtherance of the interests of all citizens, to regulate an owner's potential uses of land. Thus, in *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), the United States Supreme Court held municipal zoning to be a permissible exercise of the police power, while in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922), the Court held that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Such takings are described as "constructive" or "regulatory" takings.

*Zealy*, 201 Wis. 2d at 373.

¶ 14. "A 'taking' need not arise from an actual physical occupation of land by the government." *Eberle v. Dane County Bd. of Adjust.*, 227 Wis. 2d 609, 621, 595 N.W.2d 739 (1999). If a regulatory restriction or action of the government deprives a property owner of all economically beneficial use of his property, there

has been a categorical regulatory taking subject to compensation. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *Zealy*, 201 Wis. 2d at 374–75.

¶ 15. In determining whether a regulatory restriction "goes too far" for purposes of the Fifth Amendment, the United States Supreme Court has generally "eschewed any 'set formula' for determining how far is too far, preferring to 'engag[e] in. . .essentially ad hoc, factual inquiries." *Lucas*, 505 U.S. at 1015 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)); *Zealy*, 201 Wis. 2d at 373. However, the Supreme Court has recognized "at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas*, 505 U.S. at 1015. The first includes regulatory actions that bring about some form of physical "invasion" of private property. *Id.* The second includes regulatory actions that deny "all economically beneficial or productive use of land." *Id.* We have in Wisconsin interpreted this latter category to include regulatory actions that "deny the landowner all or substantially all practical uses of a property." *Eberle*, 227 Wis. 2d 622; *Zealy*, 201 Wis. 2d at 374.

¶ 16. The DNR's denial of the dredge permit in this case did not bring about a physical invasion of private property. Nor did it deny Docks all economically beneficial or productive use of its property, or substantially all practical use of its property, inasmuch as it retained the economic benefit and use of the 201 boat slips and related recreational facilities at the marina. Accord-

ingly, there has been no categorical regulatory taking under *Lucas* and *Zealy*.

¶ 17. We are left, then, with the ad hoc factual, traditional takings inquiry of *Penn Central* and *Zealy*. This involves an analysis of the nature and character of the governmental action, the severity of the economic impact of the regulation on the property owner, and the degree to which the regulation has interfered with the property owner's distinct investment-backed expectations in the property. *Zealy*, 201 Wis. 2d at 374 (citing *Penn Cent.*, 438 U.S. at 124).

¶ 18. But first there is a threshold question, and that is the nature and extent of the private property interest at stake here. This case involves riparian rights, which are subject to and limited by the public trust doctrine. The State argues that the bed and waters of Lake Superior belong to the public, not Docks, and so no taking of private property occurred. Indeed, the Supreme Court has stated that:

> [t]he hallmark of a protected property interest is the right to exclude others. That is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). That is why, the right that we all possess to use the public lands is not the "property" right of anyone—hence the sardonic maxim, explaining what economists call the "tragedy of the commons," *res publica, res nullius.*

*Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999). If Docks had no private property right to place boat slips on the

lakebed at the marina, it cannot have suffered an unconstitutional taking.

¶ 19. The public trust doctrine originated in the Northwest Ordinance of 1787 and the Wisconsin Constitution, Article IX, Section 1.[1] *See Gillen v. City of Neenah*, 219 Wis. 2d 806, 820, 580 N.W.2d 628 (1998). The state holds title to the beds of lakes, ponds, and rivers as follows:

> "The title to the beds of all lakes and ponds, and of rivers navigable in fact as well, *up to the* line of ordinary high-water mark, within the boundaries of the state, became vested in [the state] at the instant of its admission into the Union, in trust to hold the same so as to preserve to the people forever the enjoyment of the waters of such lakes, ponds, and rivers, to the same extent that the public are entitled to enjoy tidal waters at the common law."

*State v. Trudeau*, 139 Wis. 2d 91, 101, 408 N.W.2d 337 (1987) (quoting *Illinois Steel Co. v. Bilot*, 109 Wis. 418, 425, 84 N.W. 855 (1901)). This includes the beds of the Great Lakes as well as lesser inland waters. *Id.* Public ownership of the bed of a lake applies whether the water is deep or shallow, and extends to areas covered with aquatic vegetation within the ordinary high water

---

[1] Wisconsin Const. art. IX, § 1 states:

Jurisdiction on rivers and lakes; navigable waters. The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well as to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.

mark of the body of water in question.[2] *Id.* at 103–04. Although the public trust doctrine originally existed to protect commercial navigation, it has been expansively interpreted to safeguard the public's use of navigable waters for purely recreational purposes such as boating, swimming, fishing, hunting, recreation, and to preserve scenic beauty. *See State v. Bleck*, 114 Wis. 2d 454, 457, 338 N.W.2d 492 (1983); *see also Gillen*, 219 Wis. 2d at 820.

¶ 20. The legislature administers the trust for the protection of the public's rights, and it may use the power of regulation to effectuate the intent of the trust. *Id.* at 498. In this regard, as applicable here, the legislature has declared it to be unlawful to place a structure on the bed of a navigable waterway unless a permit has been granted by the DNR, or unless the structure is otherwise authorized by statute.[3] *See* Wis. Stats. §§ 30.12, 30.13; *Cassidy v. DNR*, 132 Wis. 2d 153, 158, 390 N.W.2d 81 (Ct. App. 1986). Further, the legislature has prohibited the removal of material from the bed of a navigable waterway without a permit. Wis. Stat. § 30.20.

---

[2] The high water mark is: "[T]he point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic." *State v. Trudeau*, 139 Wis. 2d 91, 102, 408 N.W.2d 337 (1987) (citing *Lawrence v. American W.P. Co.*, 144 Wis. 556, 562, 128 N.W. 440 (1911)).

[3] A "structure" for these purposes has been defined as "something constructed or built. . .something made up of more or less interdependent elements or parts." *State v. Bleck*, 114 Wis. 2d 454, 463, 338 N.W.2d 492 (1983).

¶ 21. However, subject to the requirements of the public trust doctrine, "Wisconsin has. . .recognized the existence of certain common law rights that are incidents of riparian ownership of property adjacent to a body of water." *Bleck*, 114 Wis. 2d at 466. These include:

> [t]he right to reasonable use of the waters for domestic, agricultural and recreational purposes; the right to use the shoreline and have access to the waters; the right to any lands formed by accretion or reliction; the right to have water flow to the land without artificial obstruction; the limited right to intrude onto the lakebed to construct devices for protection from erosion; and the right, now conditioned by statute, to construct a pier or similar structure in aid of navigation.

*Cassidy v. DNR*, 132 Wis. 2d at 159 (footnotes omitted).

¶ 22. The rights of riparian owners, however, are qualified, subordinate, and subject to the paramount interest of the state and the paramount rights of the public in navigable waters. *Bleck*, 114 Wis. 2d at 467–68. The common law only requires that riparian owners be allowed reasonable access and use. *Sterlingworth Condo. Ass'n, Inc. v. DNR*, 205 Wis. 2d 710, 731, 556 N.W.2d 791 (Ct. App. 1996).

> [E]very. . .right which a riparian owner acquires, as such, to the waters . . . by his land, is restricted always to that which is a . . . reasonable use, and these terms are to be measured and determined by the extent and capacity of the [lake], the uses to which it has been put, and the rights that other riparian owners on the same [lake] also have.

511

*Id.* (citing *Apfelbacher v. State*, 167 Wis. 233, 239, 167 N.W. 244, 245 (1918); *State v. Zawistowski*, 95 Wis. 2d 250, 261–62, 290 N.W.2d 303, 309 (1980)).

██

¶ 23. The public trust doctrine as an encumbrance on riparian rights is established "by judicial authority so long acquiesced in as to become a rule of property." *Franzini v. Layland*, 120 Wis. 72, 81, 97 N.W. 499 (1903). It is part of the organic law of the state, and is to be broadly and beneficially construed. *Diana Shooting Club v. Husting*, 156 Wis. 261, 271–72, 145 N.W. 816 (1914).

¶ 24. The DNR's denial of the dredging permit affected only Docks' ability to construct the final 71 boat slips on the bed and in the waters of Lake Superior, and, as such, implicated only Docks' riparian rights, which are subject to the public trust doctrine. Assuming that riparian rights, subordinate as they are to the rights of the public, are included in the "bundle of rights" recognized as private property for purposes of Fifth Amendment takings analysis, Docks has failed to demonstrate a compensable regulatory taking under *Penn Central* and *Zealy*.[4]

---

[4] Docks claimed at oral argument that *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913) supported its position that it had a property right for Fifth Amendment purposes in the 71 additional boat slips. The riparian property owner in *Chandler-Dunbar* claimed a right to construct in the river and upon its land such structures as were necessary to control and use the current of the river for commercial purposes, provided only that such structures not impede or hinder navigation. As the Court noted, under state law, the owner of riparian land carried title all the way to the middle thread of the riverbed. However, the Court found this title to be qualified at best, subordinate to the public right of navigation.

¶ 25. In *Zealy*, we noted that the United States Supreme Court has not endorsed an analysis that subdivides a contiguous property for purposes of determining whether a compensable taking has occurred. *Zealy*, 201 Wis. 2d at 375–76.

> [R]ather, the Court has consistently held that a landowner's property in such a case should be considered as a whole.
>
> > " 'Taking' " jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole. . . .
>
> *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. at 2662–63. Similarly, in *Keystone [Bituminous Coal Ass'n v. DeBenedictis],* 480 U.S. at 498, 107 S.Ct. at 1248–49, the Court noted practical arguments

The Court stated that the riparian owner had the "right of access to deep water, and when not forbidden by public law may construct for this purpose, wharves, docks, and piers in the shallow water of the shore. But every such structure in the water of a navigable river is subordinate to the right of navigation, and subject to the obligation to suffer the consequences of the improvement of navigation, and must be removed if Congress, in the assertion of its power over navigation, shall determine that their continuance is detrimental to the public interest in the navigation of the river" *Id.* at 70. Thus, Docks' reliance on this case is misplaced. *Chandler-Dunbar* actually stands for the proposition riparian rights are subject to the public's superior rights.

against allowing the segmentation of the property at issue:

> "Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property. A requirement that a building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area. . . . [O]ne could always argue that a setback ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes."

*Zealy*, 201 Wis. 2d at 376.

¶ 26. The Supreme Court has reaffirmed its opposition to subdividing property for purposes of takings analysis:

> [W]e rejected this analysis years ago in *Penn Central*. . .where we held that a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question.

*Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 642–44 (1993).

¶ 27. Accordingly, we evaluate the character of the DNR's action, its economic impact and the degree to which it interfered with Docks' investment-backed

expectations in light of the marina as a whole rather than the parcel that was to have contained the 71 boat slips.[5] And we do so recognizing that at most, only riparian rights of reasonable access and use, subject to the public trust doctrine, are implicated here.

¶ 28. The DNR acted primarily to protect an emergent weedbed on behalf of the public, and secondarily, to prevent interference with the rights of neighboring riparian owners. Reasonable minds can differ about whether governmental protection of weedbeds is of such a character as to outweigh private property interests. But the state, not Docks, holds title to the lakebed, and therefore, to the extent that a private property interest is implicated here, it is riparian only and therefore qualified in nature, encumbered by the public trust doctrine. We have "jealously guarded the navigable waters of this state and the rights of the public to use and enjoy them." *Delta Fish and Fur Farms v. Pierce*, 203 Wis. 519, 523, 234 N.W. 881 (1931). The character of the governmental action in this case, therefore, weighs against a finding that Docks has suffered a compensable regulatory taking.

¶ 29. Similarly, our evaluation of the severity of the economic impact of the DNR's action, and the extent to which it interfered with Docks' investment-

---

[5] Docks invites us to follow the lead of the United States Court of Appeals for the Federal Circuit in *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1181 (Fed. Cir. 1994), and adopt "a flexible approach, designed to account for factual nuances" in determining whether to consider the property as a whole or only that portion affected by the regulatory action in question. We declined to do so in *Zealy v. City of Waukesha*, 201 Wis. 2d 365, 378, 548 N.W.2d 528 (1996), and also decline to do so here, where the private property right asserted is so limited.

backed expectations, is strongly influenced by the fact that the development of this private marina on the bed and waters of Lake Superior was encumbered by the public trust doctrine and heavily regulated from the get-go. A riparian owner may apply to the DNR for a permit to remove material from or erect a structure on the bed of a navigable waterway in order to facilitate reasonable access and use. But the riparian owner does not have a right to the issuance of a permit if it is detrimental to the public interest. *See* Wis. Stat. §§ 30.12, 30.13 and 30.20.

¶ 30. Docks alleges that the revenue from the sale of the 201 existing boat slips was insufficient to cover the cost of developing the marina and that it has to date lost in excess of $1 million. It claims that the final 71 boat slips would have a combined value of approximately $1.5 million, enough to cover its losses and make a small profit. But the fact that the marina development has thus far yielded a loss does not make out a takings case, and Docks never possessed an unfettered "right" to a particular number of boat slips in the first place. Under the circumstances of this case, the DNR's action cannot be said to have "gone too far" to cause the sort of negative economic impact or substantial interference with investment expectations as to amount to a regulatory taking.

¶ 31. In any event, the DNR's denial of the final dredging permit has not interfered with Docks' present economic use of its property, considered as a whole. It has a 201-slip marina, and associated recreational facilities, and may have other means of recouping its losses. It is true that Docks' plans for a larger marina have been frustrated, but those plans were encumbered by the public trust doctrine and contingent upon the periodic issuance of DNR permits from the begin-

ning. *See Concrete Pipe*, 508 U.S. at 645 (rejecting takings claim where claimant "had long been subject to federal regulation, and '[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end' ").

¶ 32. Accordingly, we conclude that the DNR's denial of the final dredging permit did not deny Docks all economically beneficial use of its property, or substantially all practical use of its property, and as such, did not constitute a categorical regulatory taking. In addition, because the DNR's action affected only riparian rights, subordinate to the public trust doctrine, and affected only a small portion of the marina development as a whole, it cannot be said to have resulted in the sort of severe economic impact or interference with distinct investment-backed expectations as to constitute a regulatory taking under traditional, ad hoc takings analysis.

*By the Court.*—The decision of the court of appeals is affirmed.