ABKA LIMITED PARTNERSHIP, an Illinois limited partnership, Petitioner-Appellant-Petitioner,†

The ABBEY HARBOR CONDOMINIUM ASSOCIATION, LTD., a Wisconsin nonprofit corporation, Petitioner-Co-Appellant-Petitioner,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent-Petitioner,

GENEVA LAKE CONSERVANCY, INC., and Oneida County, Respondents-Respondents.

WISCONSIN REALTORS ASSOCIATION, INC., Petitioner-Appellant-Petitioner,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent-Petitioner.

ABKA LIMITED PARTNERSHIP, AN ILLINOIS LIMITED PARTNERSHIP, Petitioner-Appellant-Petitioner,†

The ABBEY HARBOR CONDOMINIUM ASSOCIATION, LTD., a Wisconsin nonprofit corporation, Petitioner-Co-Appellant-Petitioner,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent-Petitioner.

---

† Motion for reconsideration denied 10-23-02.

WISCONSIN ASSOCIATION OF LAKES, INC., Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent-Petitioner.

WISCONSIN REALTORS ASSOCIATION, INC., Petitioner-Appellant-Petitioner,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent-Petitioner.

Supreme Court

*No. 99–2306. Oral argument April 30, 2002.—Decided July 16, 2002.*

2002 WI 106

(Also reported in 648 N.W.2d 854.)

488

491

For petitioner-appellant-petitioner, ABKA Limited Partnership, and petitioner-co-appellant-petitioner, Abbey Harbor Condominium Association, Ltd., there were briefs by *Anthony S. Earl, Waltraud A. Arts* and *Quarles & Brady, LLP,* Madison, and *Thomas L. Shriner, Jr., G. Michael Halfenger, Jessica E. Price* and *Foley & Lardner,* Milwaukee, and oral argument by *Thomas L. Shriner, Jr.*

For petitioner-appellant-petitioner, Wisconsin Realtors Association, Inc., there were briefs by *Winston A. Ostrow, Donald L. Romundson* and *Godfrey & Kahn, S.C.,* Green Bay.

For petitioner-appellant, Wisconsin Association of Lakes, Inc., there was a brief by *William P. O'Connor, Mary Beth Peranteau* and *Wheeler, Van Sickle & Anderson, S.C.,* Madison, and oral argument by *William P. O'Connor.*

For respondent-respondent-petitioner, Wisconsin Department of Natural Resources, the cause was argued by *John S. Greene,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

Amicus curiae briefs were filed by *John A. Kassner* and *Brennan, Steil, Basting & MacDougall, S.C.,* Madison, on behalf of the Wisconsin Builders Association, and there was oral argument by *John A. Kassner.*

An amicus curiae brief was filed by *J. Bushnell Nielsen, Beth Ermatinger Hanan* and *Reinhart Boerner Van Deuren S.C.,* Milwaukee, on behalf of the Wisconsin Land Title Association.

An amicus curiae brief was filed by *Lawrence R. Heath,* corporation counsel, on behalf of Oneida County, Wisconsin.

An amicus curiae brief was filed by *Robert W. Larsen,* Monona, on behalf of the Lake Monona Sailing Club and the Yahara Lakes Association.

¶ 1. ANN WALSH BRADLEY, J. This case comes before us upon three petitions for review of a court of appeals decision reversing the circuit court order that affirmed an administrative law judge (ALJ) decision allowing ABKA Limited Partnership to proceed with a "dockominium" project.[1] The court of appeals concluded that the conversion of a marina to a dockominium form of ownership as proposed by ABKA and the Abbey Harbor Condominium Association violates the public trust doctrine because it transfers ownership of public waters to private individuals.

¶ 2. We agree with the court of appeals that the ALJ erred and that ABKA's conversion of its marina to a condominium form of ownership violated the public trust doctrine. However, we determine that the reason ABKA violated the public trust doctrine was because it attempted to convey condominium property contrary to Wis. Stat. § 30.133 (1995–96),[2] which prohibits certain

---

[1] *See ABKA Ltd. P'ship v. DNR,* 2001 WI App 223, 247 Wis. 2d 793, 635 N.W.2d 168 (reversing an order of the Circuit Court for Walworth County, Michael S. Gibbs, Judge). The court of appeals defined "dockominium" as a "dockside community of privately owned boats moored in slips that are purchased for year-round living" or "[a] slip in such a community." *Id.* ¶ 44.

[2] Wisconsin Stat. § 30.133 provides:

Prohibition against conveyance of riparian rights. (1) Beginning on April 9, 1994, no owner of riparian land that abuts a navigable water may convey, by easement or by a similar convey-

transfers of riparian rights. Accordingly, albeit with a different rationale, we affirm the court of appeals.

I

¶ 3. Development of the Abbey Harbor marina began in 1962 after a permit was granted for the dredging of uplands and dry marsh abutting Lake Geneva. Specifically, the permit was "to construct an enlargement of Geneva Lake as described herein, subject to the condition that the artificial waterway so constructed shall be a public waterway." The permit also stated that "a marina and boat-storage will be developed in the constructed waterway."

¶ 4. ABKA purchased the marina in 1973. Over time, and after additional permits, the marina came to include 407 boat slips. These permits provided: "The Department may change or revoke this permit if the project . . . becomes detrimental to the public interest." Until 1995, the slips were rented to the public on a seasonal basis.

¶ 5. In 1995, ABKA filed a condominium declaration in order to convert the marina into the condominium form of ownership under Wis. Stat. ch. 703. The declaration provided for the creation of 407 units, with a unit defined as a four-by-five-by-six inch "lock box" to be located in the Harbor House. The configuration was similar to a set of small post-office boxes. The unit definition in the declaration also provided that each unit would include "as an appurtenance, standard

ance, any riparian right in the land to another person, except for the right to cross the land in order to have access to the navigable water. This right to cross the land may not include the right to place any structure or material in the navigable water.

All subsequent references to the Wisconsin Statutes are to the 1995–96 version unless otherwise indicated.

494

riparian rights of owners of waterfront real estate under Wisconsin Law, and the use of an assigned boat slip corresponding to the unit designation as a part of the common elements of THE ABBEY HARBOR CONDOMINIUM."

¶ 6. ABKA and the Department of Natural Resources (DNR) agreed that ABKA would apply to the DNR for a permit authorizing the conversion of the marina into condominium property. The DNR received an objection to the permit application, alleging that the project violated Wis. Stat. ch. 30, the public trust doctrine, and the Wisconsin Constitution. Thus, a contested case hearing was held before an ALJ, pursuant to Wis. Stat. ch. 227.

¶ 7. In addition to ABKA and the DNR, a number of other entities and persons were made parties to the proceedings, including the Wisconsin Realtors Association, Inc., and the Wisconsin Association of Lakes (WAL). The Condominium Association became a co-applicant.

¶ 8. ABKA maintained that the DNR had no jurisdiction to regulate the conversion of its existing boat slips to a condominium form of ownership. The ALJ disagreed. Referring to the language in previous permits, the ALJ determined that "the DNR has jurisdiction over this matter given the plain language in the permits ('The Department may change or revoke this permit if the project obstructs navigation or becomes detrimental to the public interest.'[])." Also, relying on the DNR's regulatory authority pursuant to ch. 30, the ALJ determined that if all 407 boat slips were converted to private "dockominiums," the marina would exceed its reasonable use of the riparian frontage. In addition, the ALJ determined that the blanket approval of such a conversion would be detrimental to the public interest

within the meaning of Wis. Stat. § 30.12.[3] Accordingly, the ALJ granted a permit, but required that 287 of the slips remain as rentals. In reaching its decision, the ALJ observed, "[t]o some degree the dockominium concept involves a legal fiction: that ABKA is selling the lock-box condominium units, rather than the pier slips, for nearly $50,000."

¶ 9. The circuit court affirmed the ALJ, but the court of appeals reversed. The court of appeals did not address the question of DNR jurisdiction because it determined that ABKA had waived the right to challenge jurisdiction by agreeing to apply for a permit. In addressing the merits of the case, the court of appeals concluded that by permitting the conversion of the marina to private dockominiums as ABKA proposed, the DNR allowed control over navigable waters to be vested in private individuals in violation of the public trust doctrine.

¶ 10. The DNR, ABKA and the Condominium Association jointly (hereinafter "ABKA"), and the Realtors Association all petitioned this court for review. Several entities filed briefs as amici curiae.

II

¶ 11. Chapter 30 embodies a system of regulation of Wisconsin's navigable waters pursuant to the public trust doctrine. *Gillen v. City of Neenah*, 219 Wis. 2d 806,

---

[3] Wisconsin Stat. § 30.12(2) provides in part:

PERMITS TO PLACE STRUCTURES OR DEPOSITS IN NAVIGABLE WATERS; GENERALLY. The department, upon application and after proceeding in accordance with s. 30.02(3) and (4), may grant to any riparian owner a permit to build or maintain for the owner's use a structure otherwise prohibited under sub. (1), if the structure . . . is not detrimental to the public interest.

828, 580 N.W.2d 628 (1998); *Waukesha County v. Seitz,* 140 Wis. 2d 111, 409 N.W.2d 403 (Ct. App. 1987). Although the public trust doctrine originally existed to protect commercial navigation, it has been expansively interpreted to safeguard the public's use of navigable waters for other purposes. *R.W. Docks & Slips v. State,* 2001 WI 73, ¶ 19, 244 Wis. 2d 497, 628 N.W.2d 781.[4]

█

¶ 12. Regulation and enforcement of this public trust rests with both the legislature and the DNR. *Borsellino v. DNR,* 2000 WI App 27, ¶ 17, 232 Wis. 2d 430, 606 N.W.2d 255 (Ct. App. 1999). The legislature has delegated to the DNR broad authority to regulate under the public trust doctrine and to administer ch. 30. *See State v. Town of Linn,* 205 Wis. 2d 426, 443–44, 556 N.W.2d 394 (Ct. App. 1996).

¶ 13. Section 30.133, as a provision in ch. 30, is included in the public trust doctrine and forms part of the basis for the DNR's jurisdiction over ABKA's proposed condominium project. It provides:

> Prohibition against conveyance of riparian rights. (1) Beginning on April 9, 1994, no owner of riparian land that abuts a navigable water may convey, by easement or by a similar conveyance, any riparian right in the land to another person, except for the right to cross the land in order to have access to the navigable water. This right to cross the land may not include the right to place any structure or material in the navigable water.

---

[4] For a detailed discussion of the evolution of the public trust doctrine, see *Muench v. PSC,* 261 Wis. 492, 53 N.W.2d 514 (1952).

¶ 14. In addition to making other assertions, ABKA renews its jurisdictional arguments in this court, contending that neither § 30.133 nor any other part of the public trust doctrine as embodied in ch. 30 confers jurisdiction on the DNR to regulate the change in ownership of its marina. Similarly, the Realtors Association contends that the DNR does not have jurisdiction to "reopen" a valid permit under the public trust doctrine based only on a change in ownership.

¶ 15. Accordingly, this case presents a preliminary issue of the DNR's jurisdiction to regulate ABKA's conversion of its marina to a condominium form of ownership. Whether the DNR has jurisdiction to regulate is a question of law subject to independent appellate review. *Rusk County Citizen Action Group, Inc. v. DNR,* 203 Wis. 2d 1, 6, 552 N.W.2d 110 (Ct. App. 1996). We determine that the DNR has jurisdiction.

¶ 16. Contrary to what ABKA and the Realtors Association assert, this case is not about whether the DNR had authority to "reopen" a permit or whether ABKA had to seek a permit. These assertions ignore the DNR's statutory authority to enforce the public trust doctrine, the reality of the regulation process, and the facts of this case.

¶ 17. Pursuant to Wis. Stat. § 30.03(4), the DNR may bring an enforcement action when it learns of a "possible violation" of the public trust doctrine. Specifically, § 30.03(4) provides:

> (a) If the department learns of a possible violation of the statutes relating to navigable waters or a possible infringement of the public rights relating to navigable waters, and the department determines that the public

interest may not be adequately served by imposition of a penalty or forfeiture, the department may proceed as provided in this paragraph, either in lieu of or in addition to any other relief provided by law. The department may order a hearing under ch. 227 concerning the possible violation or infringement, and may request the hearing examiner to issue an order directing the responsible parties to perform or refrain from performing acts in order to fully protect the interests of the public in the navigable waters.

■

¶ 18. Thus, to summarize the import of this statute for our purposes here: it provides that if the DNR "learns of a possible violation of the statutes relating to navigable waters," it may pursue an enforcement action "either in lieu of or in addition to any other relief provided by law." The DNR may then request the ALJ to issue an order directing the responsible parties to "perform or refrain from performing acts." Essentially, under § 30.03(4), the DNR has jurisdiction to pursue any "possible violation" of the public trust doctrine as embodied in ch. 30, and it may request broad injunctive-type relief.

¶ 19. There were several possible violations of the public trust doctrine, as is apparent from the issues addressed in the ALJ's decision. ABKA's dockominium project may have been exceeding its reasonable use of the State's navigable waters, may have been detrimental to the public interest as that concept is used in ch. 30, or, as illustrated by the arguments before the ALJ, may have run afoul of § 30.133. In addition, as the ALJ determined, two of the permits that ABKA held specifically recognized DNR's jurisdiction to change or revoke the permit "if the project . . . becomes detrimental to the public interest."

499

¶ 20. The DNR explains in its brief that despite its authority under § 30.03(4), in reality it often will agree with a party to proceed under the permit process: "Encouraging persons to proceed with the disputed activities and await enforcement actions risks inviting damage that cannot be undone by after-the-fact remedies."

¶ 21. This apparently is what happened in this case. After the DNR received information about ABKA's dockominium project, counsel for the DNR sent a letter to counsel for ABKA, the key portions of which were as follows:

> As you know, the Department received information last week that boat slips at the Abbey Harbor adjacent to Lake Geneva were being sold as "condominiums." I discussed this with you on November 30, 1994, and indicated that if "condominium units" were defined in such a way that they included public navigable waters this would be a *violation of the public trust doctrine* and would be of concern to the Department.

> . . . I advised you by phone message on December 5, 1994, that the Purchase Agreement did not address our concerns about the definition of the condominium units that I had previously discussed with you and asked that you provide to us the "condominium plat and condominium declaration."

> You supplied the Abbey Harbor Condominium Declaration . . . . Upon review of these materials, it is clear there are significant problems with this condominium declaration since it includes, as part of the condominium units for which purchasers are purported to be given fee simple title and control, portions of the public navigable waters of the State of Wisconsin.

> . . . .

> We have referred this matter to the Attorney

500

General's office and . . . [t]heir initial reaction to these documents is consistent with our interpretation. *The State of Wisconsin will, if necessary, initiate action to stop the purported sale of public trust waters to private individuals and to have any transactions which may have already occurred invalidated.*

The Department will also be reviewing the permits which have been issued for the marina structures in this area. There are questions raised by these transactions and proposed transactions relative to who are "riparian owners or proprietors" who can continue to maintain pier structures in this marina area.

(Emphasis added.)

¶ 22. Pursuant to the DNR's request, ABKA made changes in its condominium declaration. Relying on the DNR's approval of the declaration, ABKA continued with its project and agreed to proceed with the permit process. However, the agreement with the DNR provided: "Nothing in this agreement limits the authority of the administrative law judge to hear and decide this matter on any legal basis presented at the hearing or by any party or raised *sua sponte* by the administrative law judge."

¶ 23. In the ensuing contested case hearing held according to ch. 227, the DNR did not take the position that ABKA's dockominium project violated § 30.133, but intervening parties did. The ALJ resolved the case by determining that ABKA had exceeded its reasonable use of the water and that its dockominium project was detrimental to the public interest. However, consistent with the possible bases for a violation of the public trust doctrine, the ALJ recognized that one of the issues was "whether the Condominium Declaration violates sec. 30.133, Stats."

¶ 24. What ABKA's and the Realtors Association's arguments fail to recognize is that for purposes of our determination of DNR jurisdiction, it is of no consequence that ABKA proceeded with the permit process under § 30.12 or that the ALJ chose to base its decision on one ground or another. The DNR's jurisdiction was triggered under § 30.03(4) because ABKA's conversion of its marina to a condominium form of ownership presented several possible violations of the public trust doctrine.[5]

¶ 25. The court of appeals, in contrast, concluded that ABKA waived its right to challenge the DNR's jurisdiction by the act of applying for a permit. We turn briefly to discuss the waiver issue.

¶ 26. None of the parties, including the DNR, supports the court of appeals decision on waiver. We agree with the parties that the court of appeals decision as to waiver was incorrect. "The jurisdiction of administrative agencies is always open for judicial review." *Kennedy v. DHSS,* 199 Wis. 2d 442, 448, 544 N.W.2d 917 (Ct. App. 1996) (citing *Union Indem. Co. v. Railroad Comm'n,* 187 Wis. 528, 538, 205 N.W. 492 (1925)).

¶ 27. The only case the court of appeals cited for its waiver rule was *Sterlingworth Condo. Ass'n v. DNR,* 205 Wis. 2d 710, 556 N.W.2d 791 (Ct. App. 1996). However, the portion of *Sterlingworth* the court of

---

[5] The dissent, like ABKA and the Realtors Association, misunderstands the jurisdictional question, and therefore mischaracterizes the jurisdictional issue as solely one of "jurisdiction to require a new permit." Dissent at ¶ 91. The question is not solely whether the DNR has jurisdiction to require a new permit, but whether its authority was triggered by a possible violation of the public trust doctrine.

appeals cited stands only for the proposition that by electing to continue with a permit hearing rather than risking an enforcement action, the applicant accepts the burden of proof as to whether what the applicant seeks is detrimental to the public interest. 205 Wis. 2d at 726–27. Nothing in *Sterlingworth* should be read for a rule that a party is unable to retain the right to challenge DNR jurisdiction upon filing of a permit application.

### III

■

¶ 28. Having determined that the DNR had jurisdiction, we turn to the merits of this case. Both the ALJ and the court of appeals majority discussed ABKA's condominium units as a "legal fiction." In the ALJ's decision, 29 of the 92 findings of fact addressed the condominium form of ownership and the rights of condominium owners as set forth in the condominium declaration. The ALJ concluded, however, that the condominium declaration was not a violation of § 30.133.

■

¶ 29. The central issue we address is whether the ALJ correctly concluded that ABKA's attempt to convey condominium property did not violate § 30.133. In addressing this issue, we must interpret and apply ch. 703, Wisconsin's condominium statute, as well as § 30.133. The interpretation and application of statutes is a question of law for this court's independent determination. *Auman v. School Dist. of Stanley-Boyd*, 2001 WI 125, ¶ 6, 248 Wis. 2d 548, 635 N.W.2d 762.

■

¶ 30. Our review of an agency decision is the same as the circuit court's. *Boynton Cab Co. v. DILHR*, 96

Wis. 2d 396, 405, 291 N.W.2d 850 (1980). We are not bound by an agency's conclusions of law. *UFE Inc. v. LIRC,* 201 Wis. 2d 274, 285, 548 N.W.2d 57 (1996). To the contrary, "[t]he court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law." Wis. Stat. § 227.57(5). Although we give due weight or great weight deference to agency conclusions of law when appropriate, here the interpretation of § 30.133 presents a question that is "clearly one of first impression" and thus warrants no deference. *UFE,* 201 Wis. 2d at 285.

¶ 31. In resolving the issue before us, we rely on several statutes in ch. 703, but principally the statute that defines a condominium "unit," Wis. Stat. § 703.02(15). Our interpretation of the Wisconsin condominium statutes is aided by a comparison to the Uniform Acts, which Wisconsin has not adopted. Applying these statutes and § 30.133 to ABKA's dockominium project, we conclude that the ALJ erred in approving the attempted conversion because the project was a conveyance of riparian rights in violation of § 30.133.

A.

¶ 32. A "condominium" is defined as "property subject to a condominium declaration established under this chapter." Wis. Stat. § 703.02(4). The declaration is "the instrument by which a property becomes subject to this chapter." § 703.02(8).

¶ 33. The basic types of ownership interests in a condominium consist of the "unit" and the "common elements." The "unit" is:

> a part of a condominium intended for any type of independent use, including one or more cubicles of air

at one or more levels of space or one or more rooms or enclosed spaces located on one or more floors (or parts thereof) in a building.

§ 703.02(15).[6] Common elements are "all of a condominium except its units." § 703.02(2). A common element is a "limited common element" if it is "identified in a declaration or on a condominium plat as reserved for the exclusive use of one or more but less than all of the unit owners." § 703.02(10). A unit, together with its undivided interest in the common elements, constitutes real property. Wis. Stat. § 703.04.

¶ 34. ABKA's declaration language as approved by the DNR defines a unit as a lock box that includes, as an appurtenance, riparian rights and the use of a boat slip. The "unit" is:

> that separate area of the condominium intended for independent, private use, comprised of a cubicle of space defined by a "Lock Box" located within the Harbor House as shown in the Condominium Plat. . . . The dimensions of each unit shall be approximately four (4) inches in width, five (5) inches in height, and six (6) inches in length. Each unit shall include as an appurtenance, standard riparian rights of owners of waterfront real estate under Wisconsin Law, and the use of an assigned boat slip corresponding to the unit designation as a part of the common elements of THE ABBEY HARBOR CONDOMINIUM.

¶ 35. The declaration lists the common elements as:

> all of THE ABBEY HARBOR CONDOMINIUM, real property, and real property interests, improvements and appurtenances as described in this Declaration,

---

[6] "A unit may include 2 or more noncontiguous areas." Wis. Stat. § 703.02(15).

except the individual units . . . and shall include . . . the marina shoreline, sea wall and sidewalk along said shoreline . . . all docks, boardwalks, piers and pilings contained within the marina . . . the Harbor House, outdoor swimming pool, boat launching ramp . . . and any and all other parts or elements of the condominium Property as described in this Declaration . . . .

The section of the declaration describing which elements are limited common elements includes the following provision:

Boat Slips. Each unit owner, as a limited common element appurtenant exclusively to his unit, shall have riparian rights to use of the space beside the pier or piers corresponding to his unit number as shown in the Condominium Plat, for use as a boat slip.

¶ 36. Examining the condominium statutes in light of ABKA's dockominiums, we begin with the statutory definition of unit. As previously noted, the statutory definition of unit states that it is a "part of a condominium intended for any type of independent use, including one or more cubicles of air at one or more levels of space or one or more rooms or enclosed spaces located on one or more floors (or parts thereof) in a building." § 703.02(15). Our focus is on the language providing that the unit must be "intended for any type of independent use."

¶ 37. The requirement in § 703.02(15) that the unit be "intended for any type of independent use" must be read with Wis. Stat. §§ 703.05 and 703.09(1). Section 703.05 states:

Ownership of units. A unit owner is entitled to the exclusive ownership and possession of his or her unit.

Section 703.09(1) provides:

(1) A condominium declaration shall contain:

. . . .

(g) Statement of the purposes for which the building and each of the units are intended and restricted as to use.

Reading these statutes together, we derive a number of rules and principles.

██

¶ 38. First, the types of uses for which condominiums may be created are potentially broad, provided that the condominium otherwise complies with the other statutory requirements. For example, the condominium form of ownership apparently has been applied to aircraft hangars as well as grain storage bins. *Wisconsin Condominium Law Handbook* §§ 12.22A and 12.22B, Supp. 12–2 (1997).

██

¶ 39. Second, despite the potential breadth of the statute, its application is limited by statutory language that the condominium unit be "intended for . . . independent use." The reference to "independent use" does not operate only to describe the exclusive ownership interest in the unit. If that were so, § 703.05 would be unnecessary. Likewise, § 703.05 shows that the legislature used the term "exclusive," not "independent," to refer to an owner's separate ownership interest. Accordingly, the phrase "independent use" refers to something more than the concept of exclusive ownership.

██

¶ 40. Third, the purpose for which the units are intended must be stated in the declaration. That each unit must have a stated purpose also reinforces the

conclusion that "independent use" in § 703.02(15) refers to something more than exclusive ownership of the unit.

¶ 41. Any condominium in Wisconsin must comply with these rules and principles. In addition, it is axiomatic that the use for which units are intended along with their purpose as stated in the declaration must comply with other applicable law.

¶ 42. Our interpretation of the statutory definition of "unit" and its application to this case is also aided by a comparison to the Uniform Condominium Act and its variant, the Uniform Common Interest Ownership Act. The Uniform Acts have not been adopted in Wisconsin.

¶ 43. The Uniform Condominium Act provides that a "unit" is a "physical portion of the condominium designated for separate ownership or occupancy." 7 U.L.A. Part II, § 1–103(25), p. 217 (Master ed. 1997). Similarly, the Uniform Common Interest Ownership Act defines a "unit" as a "physical portion of the common interest community designated for separate ownership or occupancy." 7 U.L.A. Part I, § 1–103(31), p. 482.

¶ 44. More important for our purposes, these definitions of unit define "condominium" and "common interest community" as "real estate," which under the Uniform Acts is "*any* leasehold or other estate or interest *in, over, or under land,*" and includes "parcels with or without upper or lower boundaries, and spaces that may be filled with air or *water.*" 7 U.L.A. Part II, § 1–103(7) and (21), p. 215–16; 7 U.L.A. Part I, § 1–103(7) and (26), pp. 479, 481 (emphasis added). Thus, under the Acts, a unit may be any physical portion of any interest in, over, or under land, including spaces filled with air or water.

¶ 45. Wisconsin's definition of unit makes the unit a part of the condominium "property," which is defined in ch. 703 as "unimproved land, land together with improvements on it or improvements without the underlying land." § 703.02(14). Thus, in addition to providing a qualitatively different definition of the type of property that may become a unit, Wisconsin's condominium statutes are without reference to water or interests in it, unlike the Uniform Acts.

¶ 46. Wisconsin's condominium statutes were enacted in 1963 and modeled after the Federal Housing Authority Model Condominium Statute of 1961. *Wisconsin Condominium Law Handbook* at § 1.4, p. 1–5. This model statute was designed primarily for high-rise developments. *Id.*

¶ 47. In 1977, the condominium statutes were replaced to provide more flexibility in the development, creation, and operation of condominiums. *Wisconsin Condominium Law Handbook* at § 1.4, p. 1–5; *see also* ch. 407, Laws of 1977. Nonetheless, the key language in the definition of "unit" remained unchanged. *See* Wis. Stat. § 703.02(1) (1975).[7] The statute has always required that the unit be intended for "independent use."

¶ 48. In short, Wisconsin's definition of unit, particularly when juxtaposed with the Uniform Acts, reveals no legislative intent to permit a boat slip to be

---

[7] The definition formerly read in full:

"Unit" means a part of the property subject to this chapter intended for any type of independent use, including one or more cubicles of air at one or more levels of space, or one or more rooms or enclosed spaces located on one or more floors (or parts thereof) in a building, and with a direct exit to a public street or highway or to a common area or limited common area leading to such a street or highway.

Wis. Stat. § 703.02(1) (1975).

conveyed as a condominium unit. Considering this, and applying the rules and principles from the condominium statutes, we determine that four-by-five-by-six inch lock boxes are not "intended for any type of independent use" within the meaning of § 703.02(15). Rather, they are phantom units that do not meet with the statutory definition.

¶ 49. In contrast to the lock boxes, ABKA's boat slips clearly are intended for a type of independent use: docking a boat. However, the slips are not the units under ABKA's declaration. They are limited common elements. Under ABKA's declaration, the four-by-five-by-six inch lock boxes are the units.[8] Although the lock boxes may be intended for exclusive ownership and possession by the unit owner, that does not mean they are "intended for any type of independent use" within the meaning of the statute.

¶ 50. That the lock boxes are not intended for any type of independent use is illustrated by the fact that the declaration lacks a statement describing the purpose or use of the units apart from their appurtenant boat slip. The declaration states that the "units and their appurtenant boat slips in THE ABBEY HARBOR CONDOMINIUM are designated for either recreational uses and purposes or commercial uses and purposes, as set forth in Section 10 herein." Section 10 provides: "The Condominium units and appurtenances in THE ABBEY HARBOR CONDOMINIUM are intended for and restricted to marina, storage, boat

---

[8] A photograph of the lock boxes is attached at the end of this opinion.

slip and related recreational uses as governed by the terms and conditions contained herein and the By-Laws of the Association."

¶ 51. It is a sham to suggest that these four-by-five-by-six inch lock boxes are being conveyed for such independent uses as stated in the declaration. They exist for the purpose of conveying the common elements and appurtenant riparian rights. A unit cannot serve primarily as a conduit for another use.

¶ 52. Any assertion that the four-by-five-by-six inch cubicles are intended for any type of independent use is belied by ABKA's marketing materials for the dockominiums. Marketing materials used by ABKA do not feature or even describe the lock boxes. Rather, they refer to "slip ownership" and include a brochure promoting "a place on the lake . . . to call your own . . . ." The brochure prominently features a definition of "dockominium" as "individual ownership of the right to use the waterway bordered by a pier and catwalks held in joint dominion (as in a marina)."

¶ 53. We agree with the ALJ's finding:

> Unlike other condominium units, the lock box itself does not inherently have much value. The value of the "dockominiums," as the Abbey has marketed these unique condominium units, is largely due to the other amenities that are at this location and are part of the individual common area.

(Citations omitted.) The court of appeals majority also agreed. It concluded that "unlike most condominium units, the lock-box itself has no inherent value; rather, the appurtenant rights attached to the conveyance are the valuable commodity." *ABKA Ltd. P'ship v. DNR*, 2001 WI App 223, ¶ 43, 247 Wis. 2d 793, 635 N.W.2d 168.

¶ 54. As WAL notes, ABKA at one time platted the boat slips themselves as the "units" for its condominium project. This fact also persuades us that the lock boxes are not intended for any type of independent use by the owner.

¶ 55. In short, ABKA's condominium declaration as approved by the DNR fails to create valid units under § 703.02(15) because the units defined in ABKA's declaration have no independent use. Because there are no valid units, there is not a valid condominium conveyance of real property.

B.

¶ 56. Without a valid condominium unit, the transfer of riparian rights that ABKA's declaration purports to accomplish is in violation of § 30.133, which provides that "no owner of riparian land that abuts a navigable water may convey, by easement or by a similar conveyance, any riparian right in the land to another person, except for the right to cross the land in order to have access to the navigable water." In analyzing why the transfer that ABKA has attempted violates § 30.133, some additional background on riparian rights law is necessary.

¶ 57. Riparian owners are those who have title to the ownership of land on the bank of a body of water. *Ellingsworth v. Swiggum,* 195 Wis. 2d 142, 148, 536 N.W.2d 112 (Ct. App. 1995). A riparian owner is accorded certain rights based upon title to the ownership of shorefront property. *Sea View Estates Beach Club, Inc. v. DNR,* 223 Wis. 2d 138, 157, 588 N.W.2d 667 (1998). These rights are well defined and, though sub-

ject to regulation, include the right to use the shoreline and have access to the waters, the right to reasonable use of the waters for domestic, agricultural and recreational purposes, and the right to construct a pier or similar structure in aid of navigation. *See id.* A riparian owner is entitled to exclusive possession to the extent necessary to reach navigable water and to have reasonable access for bathing and swimming. *Id.*

¶ 58. One water rights treatise explains, "every state has accepted at least some form of transferring riparian rights apart from the land that gave rise to the rights. *Water and Water Rights* § 7.04, p. 7–91 (Robert E. Beck, ed. 2001). However, "most courts have not accepted the full transferability of riparian rights." *Id.* at 7–92. Instead, "courts have evolved complex rules that vary from state to state to define the extent to which riparian rights might be transferred and to protect the interests of those who will be affected by the transfer even though not direct parties to the transfer." *Id.*

¶ 59. With that background on riparian rights law in mind, we turn to § 30.133 and the proper application of its language prohibiting the transfer of riparian rights "by easement or by a similar conveyance." We begin by noting that riparian rights have been characterized to be, in some senses, like an easement:

> Under common law in most states, the riparian rights are an interest in real estate, somewhat like an easement, that is, the right to use land. Unlike an easement, however, riparian rights in many states can be severed from the uplands to which they were originally appurtenant, and can be sold to others.

Gurdon H. Buck, *Dockominium Documents,* C833 ALI-ABA 261, 264 (1993). The way that the quoted source distinguishes riparian rights from an easement goes to the heart of § 30.133.

¶ 60. Section 30.133 was the legislature's response to *Stoesser v. Shore Drive P'ship,* 172 Wis. 2d 660, 668, 494 N.W.2d 204 (1993), in which this court concluded that "Wisconsin follows the general rule that riparian rights can be conveyed to non-riparian owners by easement." The legislature did not agree with the court's conclusion. The fiscal analysis in the drafting file for the act that created § 30.133 notes that while the statute would have little or no fiscal effects, it had "significant policy implications."

¶ 61. Wisconsin's approach under § 30.133 has been identified as unique:

> Many people assume that one can convey the riparian rights apart from the land just as readily as one could convey riparian land without the appurtenant riparian rights. . . . More and more states have now come to accept that such grants are effective to some extent, with the effect varying, depending on whether the rights sought to be conveyed relate to consumptive or nonconsumptive uses. *Wisconsin, on the other hand, has now expressly prohibited the conveyance of riparian rights, effective April 9, 1994.* Presumably this means apart from the conveyance of riparian land.

*Water and Water Rights* at § 7.04(a)(3), pp. 7–97 – 7–98 (footnotes omitted).

¶ 62. Nonetheless, ABKA asserts that § 30.133 does not apply because its dockominium owners own riparian property in common. Similarly, the Realtors

Association asserts that § 30.133 has nothing to do with the condominium form of ownership. We disagree with both assertions.

¶ 63. ABKA's argument implicitly recognizes that § 30.133 prohibits the conveyance of riparian rights apart from riparian property. It relies on the premise that the purchasers of its phantom units own riparian property in common in asserting it has not violated § 30.133. However, the purchasers of ABKA's phantom units do not own riparian property in common because there has been an incomplete condominium conveyance under the condominium statutes. Under § 703.04,[9] it is the "unit, together with its undivided interest in the common elements" that constitutes "real property." Without a valid unit, the unit "owners" do not hold real property, and the declaration is left to convey nothing more than riparian rights unattached to any real property interest.

¶ 64. Without a valid unit, that is, a unit with an independent use, what is left is an attempt to convey riparian rights not by easement, but "by a similar conveyance" in violation of § 30.133. Under § 30.133, riparian rights must be conveyed as attached to something; here, they are attached to nothing. ABKA is attempting to convey riparian rights qua riparian rights. Conveyances of property and property rights are circumscribed by state statutes and regulations.

¶ 65. Here, contrary to what ABKA and the Realtors Association asserts, ABKA's conveyance of riparian rights to dockominium owners is in violation

---

[9] Wisconsin Stat. § 703.04 provides in full:

A unit, together with its undivided interest in the common elements, for all purposes constitutes real property.

of § 30.133.[10] The ALJ made an erroneous determination of law when it concluded to the contrary. See § 227.57(5).

¶ 66. Under the Uniform Acts and some other states' statutes, such forms of dockominiums may be permissible. For example, the Ohio condominium statutes include the following provision:

> "Unit," in the case of a water slip, means a part of the condominium property consisting of the land under a portion of the water in a water slip . . . and designated as a unit in the declaration . . . ."

Ohio Rev. Code Ann. § 5311.01(I)(2) (2002).

¶ 67. Such is not the state of the law in Wisconsin. Our condominium statutes, unlike the Uniform Acts or the Ohio statute, require an independent use. Unlike other states, Wisconsin also has § 30.133, which greatly limits the transfer of riparian rights separate from the shoreland to which the rights attach. If the law is to change, the legislature must act. It is free to amend the condominium statutes or § 30.133, though as always, within constitutional limits.

¶ 68. We note that residential condominium units that provide for the use of boat slips are readily distinguishable from ABKA's lock boxes. Residential condo-

---

[10] In stating that our decision stands for the proposition that "a condominium is essentially the equivalent of an easement," the dissent paints with far too broad a brush. Dissent at ¶ 111. We do not determine that a condominium is "essentially the equivalent of an easement." Our holding is much narrower: an attempt to transfer riparian rights attached to invalid condominium units is an attempt to transfer riparian rights by a conveyance similar to an easement, and thus a violation of § 30.133.

minium units are intended for a type of independent use. Their true purpose, living space for human beings, may readily and accurately be stated in a condominium declaration. Such units would comply with the statutory definition of "unit," would allow for a valid condominium conveyance, and would create common interest ownership in riparian property. Therefore, residential units that provide for the use of a boat slip would not contravene § 30.133.

## IV

¶ 69. In sum, we determine that the DNR had jurisdiction over ABKA's conversion of its marina to a condominium form of ownership. We also determine that the ALJ erred in approving this attempted conversion because it was a conveyance of riparian rights in violation of § 30.133. Accordingly, albeit on different grounds, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 70. JON P. WILCOX, J., did not participate.

¶ 71. WILLIAM A. BABLITCH, J. *(concurring)*. First, it is important to note what this case is *not* about. It is *not* as one commentator stated—*see* Ray Rivard, *Who Will Guard the Guards?*, Lakeland Times (Minocqua, Wisconsin), June 21, 2002, at 11–12—about whether private docks and piers belong to the state or the private owner. This case involves the concept of multi-owners of one dock or pier, known as dockominiums, and it does not touch upon individual docks and piers as they are generally known today.

¶ 72. Also, it is *not* about allowing a non-property owner to cross private property to access the water, as alleged by the same concerned commentator. This case does not touch upon the right of private property owners to keep whomever they want off their property.

¶ 73. What this case *is* about is the right of joint riparian owners who are part of a condominium to place a dockominium, owned jointly by the owners on the public waters abutting their property. Most significantly, and why I concur, it is about whether condominium owners have a riparian zone significantly smaller than could exist under any other form of real property ownership, and thereby have a right to construct and operate a dock or docks that no other private landowner would be allowed.

¶ 74. I join the majority opinion, notwithstanding my belief that the majority opinion does not go far enough. I would prefer the holding of the court of appeals: dockominiums are a per se violation of the public trust doctrine. Putting it another way, I would hold that the conveyance of dockage rights pursuant to a condominium agreement is a conveyance that is forbidden under Wis. Stat. § 30.133(1). I reach this conclusion for a simple reason: allowing one riparian owner to divide the owner's riparian zone and sepa-

rately convey legal interest in the resulting "lots" will have significant detrimental effect on the public waters of this state. This concept was well expressed in the brief of the Wisconsin Association of Lakes, Inc., which stated: "No statute has ever expressly authorized a riparian owner to fractionalize the riparian zone. . . . Until this case arose, no court had ever considered whether a riparian has an implied right to do so. . . . Subdivision of the riparian zone is beyond the reasonable use rights of riparian owners."

¶ 75. The dissent misses the mark when it asserts, in passing, that the only change here was a change in ownership. That is akin to the old saw: "Besides that Mrs. Lincoln, how did you enjoy the play?" The change in ownership is critical because the change involves going from one owner with riparian rights to potentially 407 owners with riparian rights of ownership in the dock. That is a fact that the dissent minimizes, but to me it is the most significant of all.

¶ 76. State law as well as local ordinances mandate minimum lot widths on lakes, varying from 65 feet to 200 feet or more. This of course greatly limits the number of piers and docks allowable on the shoreline. The concept of allowing a riparian owner to fractionalize the owner's riparian rights subverts this policy. Again, as stated by the Wisconsin Association of Lakes, Inc., "excessive fragmentation of the riparian zone is detrimental to the public interest."

¶ 77. It is axiomatic that the public waters of this state belong to the public. The public is entitled to the full reasonable use and enjoyment of these waters, including the enjoyment that comes with the natural beauty of the waters. One can easily imagine the damage to the aesthetic appeal of our public waters if this concept is allowed. Most lakes in this state are far

smaller than the 5,262 acres of Geneva Lake. Imagine the damage to the aesthetic appeal of allowing a single property owner on a 250–acre lake the right to condominiumize his or her 200 feet of frontage and then provide his or her riparian rights of dockage to the resultant numerous owners. The court avoided the fundamental issue this time, but it will be back.

¶ 78. It is a very slippery slope ABKA invites us to navigate. I would respectfully refuse the invitation.

¶ 79. DIANE S. SYKES, J. *(dissenting)*. A majority of this court, like the majority in the court of appeals, has completely invalidated the Abbey Harbor Condominium Declaration. The majority in the court of appeals did so by declaring the entire "dockominium" concept to be a per se violation of the public trust doctrine. The majority here does so because it considers the condominium units to be invalid under the condominium statute's definition of "unit," Wis. Stat. § 703.02(15), so that they are nothing more than "sham" conduits for the illegal conveyance of riparian rights "by easement or by a similar conveyance" in violation of the public trust principles embodied in Wis. Stat. § 30.133.

¶ 80. Although it does not explicitly say so, by invalidating the condominium declaration, the majority extinguishes the real property rights of the 185 condominium owners who purchased "dockominiums" at the Abbey Harbor Marina. According to the majority opinion, those persons—heretofore condominium owners— have paid for, mortgaged, recorded title to, paid taxes on, insured, and (for the last six years) possessed and used, *precisely nothing,* because what they might otherwise have reasonably assumed was real property (because the statutes say so) was actually nothing more

than a collection of "phantom units" unrecognized by the law (because a majority of this court now says so).

¶ 81. Incredibly, the majority obliterates the property rights of these condominium owners in the context of a Chapter 227 judicial review of a DNR permit proceeding under Wis. Stat. § 30.12—a proceeding which the DNR had no statutory jurisdiction or authority to convene in the first place (more about that later). The majority has therefore not confined itself to merely affirming or reversing a regulation, restriction, or condition on a real property owner's use or improvement of his property, which is the usual business of land use regulatory agencies like the DNR, and which ordinarily defines the legitimate boundaries of judicial review of an agency's actions. The majority has instead used this permit proceeding as a vehicle to invalidate the entire condominium declaration itself, and therefore has eliminated each condominium owner's *entire real property interest.*

¶ 82. The majority has adopted an analysis that will in large part be unrecognizable to the participants in this proceeding. Certainly the court has the discretion to decide a case on grounds not advanced by the parties, but it should generally do so only when the law clearly requires it, which is hardly the case here. In any event, doing so in this case is simply not credible.

¶ 83. The DNR never argued that Wis. Stat. § 30.133 outright prohibits these condominiums, much less provides a basis for its exercise of permit jurisdiction. The Wisconsin Association of Lakes referenced Wis. Stat. § 30.133 only in passing in its brief in this court, and did not argue it here as grounds for denial of the permit. The Lake Monona Sailing Club, in its amicus curiae brief, invoked the statute with a little more fanfare, but not much. The administrative law

judge ("ALJ") firmly rejected any suggestion that Wis. Stat. § 30.133 was implicated *at all*—either as a basis for the DNR's permit jurisdiction or substantively. And *not a single party* in this multiple-party, hotly contested permit proceeding *ever* argued that the condominium units at the Abbey Harbor Marina did not meet the definition of "unit" under Wis. Stat. § 703.02(15), or that the condominium declaration was otherwise invalid under Chapter 703.

¶ 84. Clearly, the majority disapproves of "dockominiums," but apparently could not find anything persuasive in the arguments of those who oppose this particular form of marina ownership upon which to base its decision. What else could explain the majority's excursion into a novel theory asserted by no one? If anyone thought for a minute that these condominium units were invalid under Wis. Stat. § 703.02(15), we surely would have heard about it. The DNR and the ALJ both rejected the idea that Wis. Stat. § 30.133 was at all significant: it occupies two numbered paragraphs of the ALJ's opinion, which otherwise contains 92 numbered paragraphs of factual findings and 26 numbered paragraphs of legal conclusions, as well as a lengthy analysis.

¶ 85. We accepted review in this case on three highly important issues of state-wide impact, roughly paraphrased as follows: 1) does the filing of a permit application with an administrative agency while specifically objecting to the agency's jurisdiction and having obtained the agency's express agreement that the jurisdictional issue is not waived, nevertheless waive any objection to the agency's jurisdiction; 2) does the DNR have jurisdiction or authority under Wis. Stat. § 30.12 to require the owner of a validly permitted marina to apply for a new permit when the ownership of the

marina changes to condominium form; and 3) is the condominium form of ownership or the condominium declaration in this case inconsistent with the public trust doctrine? The majority properly answers the first question "no." The majority's resolution of the latter two issues is seriously flawed.

¶ 86. The majority omits some important factual and procedural background, and sidesteps much of the legal analysis necessary to a proper resolution of the jurisdictional and public trust doctrine issues in this case. Abbey Harbor is a private, not public, marina, although it has always maintained a public boat launch. The marina's 407 boat slips were built pursuant to properly-issued permits that were not conditioned on maintaining seasonal rentals, not dependent in any way on the marina's ownership form, and not subject to any particular restrictions as to use or operation of the marina.

¶ 87. A majority of boaters who rented slips did so year after year; 85 percent of the slips had been rented for more than one year, 42 percent for more than ten years, 20 percent for more than 15 years. In addition to the docks, piers, and boat launch, the marina also includes 20 acres of upland real estate, a Harbor House, a seawall, a sidewalk, parking lots, a swimming pool, and 4,193 feet of shoreline on a man-made lagoon adjoining Lake Geneva that was created when the marina was first developed.

¶ 88. The condominium conversion involved a change of ownership only. It did not involve a change in use or any physical changes whatsoever at the marina. There is no change in the number, size, configuration, or layout of the marina or its docks, piers, or slips. No new docks, slips, piers, or structures of any kind were placed on the bed of the harbor as a result of the

condominium conversion. There is no effect on the size or type of boat that can be moored at the marina. The conversion does not alter or impede navigational channels or safety in the harbor. It has no adverse environmental impact on wildlife, water quality or pollution, flood flow capacity, fisheries, or the natural scenic beauty of the lake.

¶ 89. The Abbey Harbor Condominium Declaration defines the condominium "units" as the individual lock-boxes in the Harbor House, together with the standard riparian rights associated with ownership of waterfront property. It also provides that condominium owners own, as tenants in common, all of the real property and improvements at the marina, including the upland real estate, the shoreline, the seawall, the Harbor House, the sidewalk, the parking lots, the swimming pool, and the docks and piers, as condominium "common elements." The slips are denominated as "limited common elements" for purposes of allocating the right of exclusive use of individual slips among the condominium unit owners.

¶ 90. The ALJ included all of the foregoing in his findings of fact, and we are required to review factual findings deferentially. *See* Wis. Stat. § 227.57(6) (reviewing court "shall not substitute its judgment for that of the agency as to the weight of the evidence" and does not disturb factual findings that are supported by "substantial evidence in the record"). "[T]he test is whether, taking into account all the evidence in the record, 'reasonable minds could arrive at the same conclusion as the agency.'" *Responsible Use of Rural and Agricultural Land v. Public Service Comm'n and DNR,* 2000 WI 129, ¶ 20, 239 Wis. 2d 660, 676, 619

N.W.2d 888; *see also Sea View Estates Beach Club v. DNR*, 223 Wis. 2d 138, 148, 588 N.W.2d 667 (Ct. App. 1998).

¶ 91. ABKA vigorously objected to the DNR's insistence that the condominium conversion required a new permit, inasmuch as nothing was changing at the marina besides its ownership. The parties negotiated the following compromise: ABKA would accede to the DNR's demand that it apply for a new permit under Wis. Stat. § 30.12 (the condominium association would later join as co-applicant); ABKA's objection to the DNR's jurisdiction to require a new permit was expressly preserved and would be an issue before the ALJ; ABKA was authorized to immediately begin selling 292 condominium units; 125 slips would be held back from sale and maintained as seasonal rentals pending the outcome of the permit proceeding, and if the ALJ required a greater number of set-asides for seasonal rental, ABKA would if necessary buy back the required number of condominium units.

¶ 92. At the time of the hearing, 185 condominium units at Abbey Harbor had been sold. The permit issued by the ALJ and affirmed by the circuit court authorized only 120 condominium units, and required ABKA to set aside 287 slips for seasonal rental, for terms not exceeding five years, for a "reasonable fee." The permit also imposed a requirement that the availability of rental slips be advertised "in the local newspaper of greatest circulation at least twice each spring," and that ABKA maintain a waiting list, and make that waiting list available for inspection by the DNR.

¶ 93. The threshold jurisdictional issue here is significant. Rather than deal with it directly, the majority manipulates it in order to facilitate the majority's

preferred resolution, and then has the audacity to suggest that this dissent "misunderstands the jurisdictional question." Majority op. at ¶ 24 n.5.

¶ 94. I am compelled, therefore, to quote from *this court's order* accepting review insofar as it states the jurisdictional issue: "Has the legislature given the DNR authority in Wis. Stat. § 30.12 to require the owner of a permitted marina to apply for a new permit solely because of a change in the form of ownership of the property to condominium?" The majority has contorted this very specific jurisdictional question into a roving inquiry into whether there is generic DNR "jurisdiction to regulate" or "authority to regulate under the public trust doctrine" in order to give both the DNR and the majority some vaguely plausible jurisdictional cover. Majority op. at ¶¶ 12, 15.

¶ 95. No matter how it maneuvers, however, the majority cannot escape the obvious: if there is no statutory permit requirement for a marina condominium conversion that involves no new placement of structures or deposits in public trust waters, then the entire administrative proceeding below was without jurisdiction, superfluous, and void.

¶ 96. It is an accepted principle of administrative law that " 'an administrative agency has only those powers as are expressly conferred or necessarily implied from the statutory provisions under which it operates . . . .' " *Grafft v. DNR,* 2000 WI App 187, ¶ 6, 238 Wis. 2d 750, 756, 618 N.W.2d 897 (quoting *Brown County v. DH&SS,* 103 Wis. 2d 37, 43, 307 N.W.2d 247 (1981)); *see also Wis. Power & Light v. Public Serv. Comm'n,* 181 Wis. 2d 385, 392, 511 N.W.2d 291 (1994). Any doubts as to the existence of an implied power of an administrative agency must be resolved against the existence of authority. *Grafft,* 2000 WI App 187, ¶ 6.

¶ 97. Wisconsin Statute § 30.12 contains the legislature's grant of permitting authority to the DNR pertaining to structures and deposits on the beds of public trust waters:

> 30.12 Structures and deposits in navigable waters prohibited; exceptions; penalty. (1) GENERAL PROHIBITION. Except as provided under subs. (4) and (4m), unless a permit has been granted by the department pursuant to statute or the legislature has otherwise authorized structures or deposits in navigable waters, it is unlawful:
>
>> (a) To deposit any material or place any structure upon the bed of any navigable water where no bulkhead line has been established; or
>>
>> (b) To deposit any material or place any structure upon the bed of any navigable water beyond a lawfully established bulkhead line.
>
> (2) PERMITS TO PLACE STRUCTURES OR DEPOSITS IN NAVIGABLE WATERS; GENERALLY. The department, upon application and after proceeding in accordance with s. 30.02(3) and (4), may grant to any riparian owner a permit to build or maintain for the owner's use a structure otherwise prohibited under sub. (1), if the structure does not materially obstruct navigation or reduce the effective flood flow capacity of a stream and is not detrimental to the public interest.

Wis. Stat. § 30.12. This statute obviously contains no requirement that pre-existing, properly-permitted boat slips must be "re-permitted" upon a change of ownership. More specifically, Wis. Stat. § 30.12 does not require that an already-permitted marina undergoing conversion to the condominium form of ownership must obtain a new permit from the DNR where the

conversion is a legal transaction only and involves no new placement of structures or deposits on the lake bed whatsoever.

¶ 98. The DNR permit proceeding at issue in this case was convened and conducted pursuant to Wis. Stat. § 30.12. The permit at the heart of this case was issued pursuant to Wis. Stat. § 30.12. Yet the majority refuses to engage in *any* analysis regarding the applicability of Wis. Stat. § 30.12.

¶ 99. Instead, the majority concludes that the DNR's authority to require a new permit resides somewhere in "the DNR's statutory authority to enforce the public trust doctrine" and "the reality of the regulation process." Majority op. at ¶ 16. The majority then proceeds to discover the DNR's permitting power in Wis. Stat. § 30.03(4), together with Wis. Stat. § 30.133, which it says "is included in the public trust doctrine and forms part of the basis for the DNR's jurisdiction over ABKA's proposed condominium project." Majority op. at ¶ 13.

¶ 100. As to Wis. Stat. § 30.133, the majority's position is remarkable, since no one else—not even the Wisconsin Association of Lakes or the Lake Monona Sailing Club—relied on that statute as providing a jurisdictional basis for the DNR's requirement that ABKA get a permit for its condominium conversion. Indeed, Wis. Stat. § 30.133 says nothing at all about permits. As the majority correctly notes later in the opinion, Wis. Stat. § 30.133 was the legislative response to this court's decision in *Stoesser v. Shore Drive P'ship,* 172 Wis. 2d 660, 494 N.W.2d 204 (1993), and prohibits the transfer of riparian rights to non-riparians "by easement or by a similar conveyance." Wis. Stat. § 30.133(1); majority op. at ¶¶ 13, 60. Whatever influence this statute might have on these proceedings, it

cannot seriously be considered to confer upon the DNR any jurisdiction to require or issue permits when no new structures or deposits are being placed on the lake bed.

¶ 101. The majority refers to the statute's status as being "included in the public trust doctrine," as if to suggest that the public trust doctrine itself provides a jurisdictional basis for the DNR's power to require a permit. Majority op. at ¶ 13. If that were true, then the DNR would have plenary power to require a permit anytime it got a whiff of any activity that it thought might implicate the public trust doctrine, whether or not a permit was statutorily required or authorized. This is a radical departure from traditional administrative agency law, which, as noted above, requires a legislative grant of authority or power for administrative agency action.

¶ 102. Neither can Wis. Stat. § 30.03(4) serve as the source of the DNR's authority to require a new permit. That statute authorizes the DNR to initiate an enforcement action to enjoin "a possible violation of the statutes relating to navigable waters or a possible infringement of the public rights relating to navigable waters." Wis. Stat. § 30.03(4). It says nothing about permits.

¶ 103. Jurisdiction to initiate an enforcement action is not the same as jurisdiction to require a property owner to obtain a permit. If the DNR had grounds to initiate an enforcement action under Wis. Stat. § 30.03(4), it certainly would have done so. Had the DNR taken the majority's position that ABKA's condominium conversion constituted a violation of Wis. Stat. § 30.133, it might have initiated an enforcement action under Wis. Stat. § 30.03(4) to stop it. Had the DNR taken the court of appeals' position that ABKA's

condominium conversion constituted a per se violation of the public's rights under the public trust doctrine, it might have initiated an enforcement action under Wis. Stat. § 30.03(4) to stop it. It did neither. Instead, the DNR invoked the permit provisions of Wis. Stat. § 30.12 and demanded that ABKA obtain a new permit, even though the condominium conversion involved no new placement of structures or deposits on the lake bed. The DNR had no authority to do so. We are confined to reviewing what the DNR did, not what it might have done. The majority's jurisdictional conclusions are analytically bankrupt.

¶ 104. Having badly botched the jurisdictional issue, the majority then evades the significant public trust doctrine questions surrounding both the "dockominium" concept generally and the ALJ's permit in particular by simply invalidating the condominium declaration under the condominium statutes. The majority concludes that the lock-boxes have insufficient "independent use" to fit the definition of "unit" in Wis. Stat. § 703.02(15), which defines a condominium "unit" as "a part of a condominium intended for *any type* of independent use, including one or more cubicles of air at one or more levels of space . . . ." Wis. Stat. § 703.02(15) (emphasis added).

¶ 105. The majority's interpretation of the statutory definition of "unit" ignores the definition's use of the modifier "any," which means: "in whatever degree; to some extent; at all . . . in any manner whatever." *Webster's Encyclopedic Dictionary of the English Language* (rev. ed. 1996). The majority also ignores the only reported case that specifically construes Chapter 703's definition of "unit," which interpreted the term expansively to include vacant condominium land upon which nothing had yet been constructed. *Aluminum Indus. v.*

*Camelot Trails Condo. Corp.,* 194 Wis. 2d 574, 582–83, 535 N.W.2d 74 (Ct. App. 1995).

¶ 106. Finally, and perhaps most glaringly, the majority's interpretation of "unit" violates the explicit rule of construction contained in the condominium statutes:

> SUBSTANTIAL CONFORMITY OF CONDO-MINIUM INSTRUMENTS AND BYLAWS SUFFI-CIENT. The provisions of any condominium instruments and bylaws filed under this chapter *shall be liberally construed to facilitate the creation and operation of the condominium.* So long as the condominium instruments and bylaws substantially conform with the requirements of this chapter, no variance from the requirements shall affect the condominium status of the property in question nor the title of any unit owner to his or her unit, votes and percentage interests in the common elements and in common expenses and common surpluses.

Wis. Stat. § 703.30(2) (emphasis added); *see also Rock Lake Estates Unit Owners Ass'n v. Lake Mills,* 195 Wis. 2d 348, 359, 536 N.W.2d 415 (Ct. App. 1995).

¶ 107. Despite this legislative mandate of liberal construction favoring the *creation* of condominiums, the majority nevertheless concludes that the condominium declaration "fails to create valid units under § 703.02(15) because the units defined in ABKA's declaration have no independent use." Majority op. at ¶ 55. True, the lock-boxes are small, and therefore could not be put to a *significant* use. But the statute explicitly sanctions condominium units susceptible of *any* type of independent use, and the declaration must be liberally construed so as not to defeat the creation of the condominium. The majority, however, concludes

that "[b]ecause there are no valid units, there is not a valid condominium conveyance of real property." *Id.*

¶ 108. Having invalidated the condominium declaration, there is really no reason for the majority to go any further, but it does. It concludes that the invalid condominium conveyance is tantamount to a conveyance of riparian rights "by easement or by a similar conveyance" contrary to Wis. Stat. § 30.133. But if the condominium conveyance is invalid under Chapter 703, how can it possibly form the basis for a violation of Wis. Stat. § 30.133? Stated differently, how can a legally ineffective condominium conveyance be deemed to violate Wis. Stat. § 30.133?

¶ 109. The majority has invalidated the condominium conveyance and therefore extinguished the property interests of the condominium unit owners. There is nothing left. There is no need to inquire into whether a legally defective condominium conveyance nevertheless accomplishes a conveyance of riparian rights "by easement or by a similar conveyance" in violation of Wis. Stat. § 30.133, requiring the attention of the DNR and this court.

¶ 110. The majority, of course, must reach this issue. Otherwise, its jurisdictional house of cards comes down. Having grounded the DNR's permit jurisdiction in large part on the notion that there is a potential violation of Wis. Stat. § 30.133 present here, the majority is bound to address the issue. In order to apply Wis. Stat. § 30.133, however, we must assume that a valid condominium conveyance occurred. It makes no sense to apply a statute that makes a certain sort of conveyance illegal to what the majority says is an already illegal conveyance; we have to assume an otherwise legal conveyance, and then apply the statute.

¶ 111. What the majority is really suggesting, then, is that a condominium is essentially the equivalent of an easement. This is preposterous.

¶ 112. A condominium constitutes a fee simple interest in real estate and by statute has the status of real property "for *all* purposes." Wis. Stat. § 703.04 (emphasis added) ("A unit, together with its undivided interest in the common elements, for all purposes constitutes real property."). Under no credible legal analysis can a condominium be relegated to the status of a mere easement or like conveyance.

¶ 113. An easement is an encumbrance on the property of another. "An easement 'is a permanent interest in another's land, with a right to enjoy it fully and without obstruction.' " *Hunter v. McDonald,* 78 Wis. 2d 338, 343, 254 N.W.2d 282 (1977). The "cases have repeatedly defined an easement as 'a liberty, privilege or advantage in land, without profit, and existing distinct from the ownership of the soil.' " *Figliuzzi v. Carcajou Shooting Club of Lake Koshkonong,* 184 Wis. 2d 572, 582, 516 N.W.2d 410 (1994); *see also Stoesser,* 172 Wis. 2d at 667.

¶ 114. Noting that the condominium owners collectively own the land and improvements at the Abbey Harbor Marina, and that "[u]nder Wisconsin law it is clear that a person 'can not maintain an easement over his own land,' " the ALJ concluded that the condominium declaration "is not the conveyance by 'easement or similar conveyance' of riparian rights within the meaning of sec. 30.133, Stats." Although the ALJ denominated this as a finding of fact, I read it as a conclusion of law.

¶ 115. An agency's conclusions of law are reviewed by reference to one of three levels of deference: "great weight," "due weight," or "de novo." *RURAL v.*

*PSC,* 2000 WI 129, ¶ 21. *"De novo* review is appropriate where there is no evidence that the agency used any special knowledge or expertise, the issue is clearly one of first impression, or the agency's position on an issue has been inconsistent." *Id.* at ¶ 22. No one has suggested that the agency lacked expertise or was inconsistent in its positions, and the issue of what constitutes an easement or like conveyance can hardly be characterized as one of first impression.

¶ 116. Accordingly, at least due weight, or possibly great weight deference is owed to the ALJ's conclusion that there is no violation of Wis. Stat. § 30.133 here. It is very difficult to flunk either of these standards of review. Due weight deference means that any reasonable legal interpretation by an agency will be upheld, unless the court finds a *more* reasonable interpretation. *Id.* at ¶ 24 n.12. That is, the agency's legal interpretation will be upheld even if there is a different, equally reasonable interpretation—in other words, a tie goes to the agency. Great weight deference means what it says: the agency almost always wins. Under either of these standards, the ALJ's determination that Wis. Stat. § 30.133 was not violated must be upheld. Any suggestion that a condominium is akin to an easement is far from reasonable.

¶ 117. Apparently the majority is not bothered one bit by the gaping holes in and circularity of its analysis. Worse, by adopting this sua sponte, terribly misguided approach, the majority has completely failed to address the critically important administrative and water law issues that were actually presented in this case, and therefore has left them for another day.[1]

---

[1] Both the ALJ's resolution of this case and the court of appeals' per se invalidation of the "dockominium" concept have

There are a number of other "dockominium" marinas around the state. Their legal status—called into question by the court of appeals' opinion—remains in substantial doubt. The majority has not only trampled on the private property rights of the individual condominium owners in this case (not to mention ABKA's), it has done significant damage to the law of condominiums, administrative agency jurisdiction, and the public trust doctrine. I dissent.

¶ 118. I am authorized to state that Justice DAVID T. PROSSER joins this dissenting opinion.

significant implications for the public trust doctrine in this state, and also potentially for takings jurisprudence. *See ABKA, Ltd. P'ship v. DNR,* Dec. No. 3–SE-95–0080 (DNR 1996); *ABKA, Ltd. P'ship v. DNR,* 2001 WI App 223, 247 Wis. 2d 793, 635 N.W.2d 168; *see also, R.W. Docks & Slips v. State,* 2001 WI 73, 244 Wis. 2d 497, 628 N.W.2d 781, *cert. denied,* 122 S.Ct. 617 (2001).